THOMAS WELSH *vs.* WILLIAM B. CANFIELD, and ISABELLA H. T. CANFIELD, ISAAC D. JONES, and JOHN T. MORRIS, Adm'rs of IRA C. CANFIELD. WILLIAM B. CANFIELD, and ISABELLA H. T CANFIELD, ISAAC D. JONES, and JOHN T. MORRIS, Adm'rs of IRA C. CANFIELD *vs.* THOMAS WELSH.

*Rights of Partners—Construction of Articles of Co-partnership.*

Whilst in general a partnership imports a communion of profits and losses among its several members, it cannot be doubted that, whatever may be their legal liability to outside parties, as among themselves a disproportionate interest as to profits and losses may be agreed upon.

A co-partnership agreement between I. C. C., W. B. C., T. W., and J. R. A., contained the following Articles: " Art. 9. It is agreed and understood that the said I. C. C., and W. B. C., shall each be entitled to three-eighths ($\frac{3}{8}$) parts of the profits, and shall bear and

pay the same proportions of the losses of this co-partnership, and the said T. W., and J. R. A., shall each be entitled to one-eighth ($\frac{1}{8}$) proportion of the profits, and shall bear each one-eighth ($\frac{1}{8}$) of the losses of said co-partnership, and that all the expenses of the business, such as rent of store, clerks' salaries, insurance, &c.; shall be borne in the same proportions, and be paid out of the funds of this co-partnership."—" Art. 14. They also agree that in the event of the net profits of the business in any one year should be so small that the portion of said T. W., and J. R. A., should not amount to two thousand five hundred dollars, ($2500,) exclusive of the interest on their unpaid capital ; that then it is agreed that their accounts shall each be credited with a sum sufficient to make that amount, unless such deficit should occur from losses sustained by fire, robbery, or other causes outside of the regular ordinary business of the co-partnership." On a bill filed by I. C. C. and W. B. C. against T. W., (J. R. A. having previously retired,) for a settlement of the partnership business, it was HELD :

1st. That Article 9, being general in its provisions upon the subject of profits and losses, must be reconciled to or controlled by Article 14, whose provisions were more specific, and which defined and detailed the mode in which the general liability described in Article 9, was to be qualified and adjusted.

2nd. That their meaning when taken together was, that the profits and losses were to be borne by the several partners in the proportion of their shares of capital, so long as the annual net profits did not fall below an amount that would divide $2500 to W. at the end of each year; should that occur, however, then Article 14, came into operation to indemnify W. for the loss he would otherwise incur under the general provisions of Article 9.

3rd. That whenever in the ordinary course of the business the actual net profits failed to divide $2500 to W. as his share, I. C. C. and W. B. C. were bound to make up the deficit to him exactly as if the business had cleared him that much.

CROSS-APPEALS from the Circuit Court of Baltimore City.

The bill in this case was filed by Ira C. Canfield, and William B. Canfield, the former of whom has since died, against Thomas Welsh, for the settlement of the partnership business of a firm composed of the complainants and the defendant. In the course of the proceedings certain

accounts were stated by the auditor, and these appeals are taken from the action of the Court below, upon questions raised by said accounts. The case is sufficiently stated in the opinion of the Court.

The cause was argued before MILLER, STONE, ROBINSON, IRVING, and RITCHIE, J.

*Bernard Carter*, for Thomas Welsh.

*E. Otis Hinkley*, for William B. Canfield.

*Isaac D. Jones*, for the administrators of Ira C. Canfield.

RITCHIE, J., delivered the opinion of the Court.

On the 28th of February, 1866, Thomas Welsh and James R. Armiger, who had previously been in the employ of the firm of Canfield and Brother, composed of Ira C. and William B. Canfield, united with the said Canfields in forming a new co-partnership, styled Canfield, Bro. and Co., under the articles of agreement filed in this cause. The stock and fixtures of the firm of Canfield and Bro., estimated at $154,313.39, were constituted the capital of the new firm, the Canfields retaining an interest of six-eighths therein, and selling to Welsh and Armiger respectively an interest of one-eighth, receiving therefor from each of them, a cash payment of five thousand dollars, and his promissory note for fourteen thousand two hundred and eighty-nine dollars and twenty cents, payable twelve months after date, with interest, the interest to be paid yearly, and such part of the principal as they could, from the profits of the business.

In 1870 Armiger withdrew from the firm, disposing of his interest to the remaining three partners, who agreed to continue the business upon the conditions and terms of

472          MARYLAND REPORTS.

Welsh *vs.* Canfield, *et al.* Canfield, *et al. vs.* Welsh.

the original articles of copartnership; the interest of Welsh in the capital of the firm, by this withdrawal of Armiger, being increased from one-eighth to one-seventh.

From 1866 to 1877 the firm was prosperous, the profits exceeding the losses.

For the years covered by this period, the auditor, in stating his account of Welsh with the firm, whenever Welsh's share of the profits is less than $2500 annually, and less than the sums specially agreed upon for the years 1871, 1874, 1875, which were severally $3000, $4000, and $3500, has, under the provisions of article 14 of the partnership agreement and its modification, for the last mentioned years, credited Welsh with a sum sufficient to make up to him these several amounts. In the year beginning March 1, 1877, and from the end of that year until December 13th, 1878, when the firm made an assignment for the benefit of their creditors, (with whom, however, they arranged, and resumed business,) the firm met with heavy losses, there being not only no profits to divide, but a large consumption of capital. In dealing with this condition of the business, the auditor has charged Welsh with his proportionate share, one-seventh, of the losses, and has credited him with only an absolute sum of $2500.00, under his construction of said article 14, which, not being equal to the diminution of his capital, he suffers an actual loss.

The auditor's report, as account "N," having been ratified, both parties appealed.

The main question in this controversy is upon the construction of Article 14 of the partnership agreement as affecting Welsh's liability for the losses for which he is held chargeable by the auditor.

The appellant, Welsh, contends, in substance, that under this Article he is guaranteed a clear annual gain of not less than $2500.00, and that consequently he is chargeable with his share of the losses only to the extent of

APRIL TERM, 1883. 473

Welsh *vs.* Canfield, *et al.* Canfield, *et al. vs.* Welsh.

diminishing his yearly profits down to that sum. The contention of the Canfields is that the extent of their obligation to make up to Welsh a deficiency in profits is limited to $2500.00; and that if, notwithstanding the benefit of a credit to him up to this amount, there still remains a deficit or loss, Welsh then becomes responsible for one-seventh thereof. In support of this contention they chiefly rely upon the 9th Article of the agreement, the operative effect of which is conceded by Welsh, but which he claims is not in conflict with Article 14, or is to be subordinated to it.

These two Articles are as follows:

"Art. 9. It is agreed and understood that the said Ira C. Canfield and William B. Canfield shall each be entitled to three-eighths ($\frac{3}{8}$) parts of the profits, and shall bear and pay the same proportions of the losses of this co-partnership, and the said Thomas Welsh and James R. Armiger shall each be entitled to one-eighth ($\frac{1}{8}$) proportion of the profits, and shall bear each one-eighth ($\frac{1}{8}$) of the losses of said co-partnership, and that all the expenses of the business, such as rent of store, clerks' salaries, insurance, &c., shall be borne in the same proportions, and be paid out of the funds of this copartnership."

"Art. 14. They also agree that in the event of the net profits of the business in any one year should be so small that the portion of said Thomas Welsh and James R. Armiger should not amount to two thousand five hundred dollars, ($2500,) exclusive of the interest on their unpaid capital; that then it is agreed that their accounts shall each be credited a sum sufficient to make that amount, unless such deficit should occur from losses sustained by fire, robbery, or other causes outside of the regular, ordinary business of the copartnership."

Whilst in general a partnership imports a communion of profits and losses among its several members, it cannot be doubted that whatever may be their legal liability to

outside parties, as among themselves a disproportionate interest as to profits and losses may be agreed upon.

That Welsh was guaranteed by the Canfields a certain interest in the profits of the firm or its equivalent, is plainly expressed in Article 14. The 9th Article being general in its provisions upon the subject of profits and losses, must be reconciled to or controlled by Article 14, whose provisions are more specific, and which defines and details the mode in which the general liability described in Article 9 is to be qualified and adjusted. There is, however, no real conflict between them, when taken to mean, which we think their proper relation to each other imports, that the profits and losses are to be borne by the several partners in the proportion of their shares of capital so long as the annual net profits do not fall below an amount that would divide $2500 to Welsh at the end of each year; should that occur, however, then the 14th Article comes into operation to indemnify Welsh for the loss he would otherwise incur under the general provisions of Article 9.

To illustrate : Suppose at the end of a given year, on adjusting the accounts of the firm, the losses on the one hand should reach an aggregate of which Welsh's proportion should be $5,000, and on the other hand his proportion of the receipts should be $10,000; in such a case he would come within the operation of Art. 9; his share of the losses would be deducted from his share of the receipts; but as his gains or profits would amount to $5000, Article 14 would remain inactive because the emergency for which it provides would not have arisen. If, however, the losses exceeded the receipts, the application of Article 14 would become material. The auditor has been governed by this Article in all those years in which *some* profits were realized but not sufficient to divide $2500 to Welsh, and adds to his share of the profits actually realized, a sufficient sum to realize him $2500. But why make up

this deficiency only when the deficit does not exceed $2500? If he is to be credited such a sum as will be equivalent to his realizing a net profit of $2500, whatever sum may be necessary to do this is clearly, we think, the sum he is entitled to receive or have the benefit of. The Canfields, judging from the previous prosperity of their business, might have reasonably entered into a stipulation to this effect; that they have been greatly disappointed cannot control the terms of a provision plain upon its face and which may fairly be supposed to have been a controlling consideration in inducing Welsh to embark in the business, because of the protection it secured him in just such a possible contingency.

To say that if " the *net profits*"—that is, the surplus left after deducting all losses, for such only can be the meaning of the term *"net profits"*—" in any one year should be so small that the portion of said Welsh should not amount to $2500, that then his account shall be credited *a sum* sufficient to make that amount"—that amount, plainly, of *net profits*—does not mean whatever sum will give him the equivalent for not realizing $2500 in net profits, or in other words he shall be so credited in his account as if he had gained that amount, we cannot comprehend the significance of the language employed. To credit Welsh with a sum as "*net* profits," and then charge him with a loss that not only eats up the sum credited but inflicts an absolute loss beyond is not giving him anything in the nature of a net gain, but only giving him the benefit of a certain sum to which it would be a misnomer to apply the term *net*.

That he was to be "credited," instead of actually paid, the sum contemplated, is of no significance, because it was the appropriate term in relation to a current business between partners, where a credit in one connection might be absorbed by a debit in another; and because, moreover, Welsh was indebted to the Canfields on his note, which it

was expressly provided should be liquidated from his profits.

Had it been meant that the Canfields should under no circumstances be liable to contribute more than the limited sum of $2500 towards making up any losses Welsh might incur, words apt to express such a limitation could have been readily employed; but according to the language used it plainly imports that the amount to be made up is measured by the deficiency he suffers—enough to realize him annually a net gain of $2500.

The only circumstances under which the Canfields are to be released from this obligation, or, in other words, as we apprehend Article 14, the only contingencies in which Welsh is to be subjected to any actual loss, are explicitly set forth in the concluding clause of this Article, as follows: "Unless such *deficit* should occur from losses sustained by fire, robbery or other causes *outside the regular, ordinary business of the copartnership.*"

Whenever, therefore, in the ordinary course of the business, the actual net profits fail to divide $2500 to Welsh as his share, the Canfields are bound to make up the deficit to him exactly as if the business had cleared him that much. For them to credit him simply with $2500, when that sum is not enough to put him in the same position as if he had made net profits to that amount, is simply to contribute a certain sum toward reducing his losses, and not to supply a substitute for gains unrealized.

Without relying on the oral testimony in the case, we can readily understand why such a guaranty would be a reasonable stipulation where the party making it, judging from the previous results of his business believes he can safely offer such an inducement to a party whom it is desirable to have as a partner, and why the latter, if a man of small means, would hesitate to embark in a business of magnitude involving large risks, without the assurance of a certain annual dependence, equivalent to what he could

earn by his personal skill and services without undertaking such a venture.

In regard to the other and minor points of contention in this case, we do not deem it necessary to discuss them in detail. After fully considering them it expresses our conclusion to say that in our view the auditor's Account "N" correctly states the money relations between Welsh and the firm, except in the particular of its charges against Welsh's capital for losses. By incorporating the substance of the supplemental statement, submitted as Account "P," with Account "N," as properly contended for by the appellant Welsh, a correct adjustment between him and the firm will be reached and the true amount due him ascertained. The order appealed from will be reversed, and the cause remanded to the end that the case may be disposed of in accordance with the views expressed in this opinion.

*Order reversed, and
cause remanded.*

(Decided 20th June, 1883.)

Robinson, J., dissented.