## WILLIAM BAKER, JR., AND CHARLES E. BAKER *vs.* SAFE DEPOSIT AND TRUST COMPANY OF BALTIMORE, EXECUTOR.

*Partnership—Contribution by One Partner to Make Good Loss of Capital Supplied by Another—Accord and Satisfaction.*

Where one partner supplies all the capital of the firm and the other partners, who furnish their time and skill, are entitled only to a share of the profits after payment of debts, then, upon liquidation of the business, any impairment of the capital must be borne by him who supplied it, and the other partners are not bound to share such loss, in the absence of an agreement to that effect.

A father formed a partnership with his sons, all the capital being sup-
plied by him. There were no written articles of partnership, but
the evidence showed that the sons were never credited with any in-
terest in the property of the firm, but only with a percentage of the
net profits, and when there were no net profits none of the partners
received anything. All debts of the firm were payable primarily
from profits. Upon the father's death and the dissolution of the
firm the debts were paid by his executor and there was a loss of
capital. Upon a bill for contribution by the executor against the
other partners, *held*, that the sons are not liable to contribute to the
payment of such loss, since the intention of the parties was that if
the profits of the business were not sufficient to pay the debts, then
they were to be paid from the capital, and that the sons should not
be liable to make good to their father any proportion of such loss.

The executor of a deceased partner alleged that the surviving part-
ners were liable to the creditors of the firm for certain debts, while
this was denied by the latter. An agreement was made by which
the surviving partners conveyed to the executor their interest in cer-
tain property belonging to the firm, and it was stipulated that the
question as to the liability of the surviving partners should not be
concluded by the arrangement. The Orphans' Court thereupon
directed the executor to pay the creditors of the firm. *Held*, that
these proceedings do not constitute an accord and satisfaction, so
as to be a bar to a bill for an accounting and contribution by the ex-
ecutor against the surviving partners, if they were liable to con-
tribute to the payment of such debts.

Appeal from a decree of the Circuit Court of Baltimore
City (WICKES, J.)

The cause was argued before McSHERRY, C. J., FOWLER,
BRISCOE, PAGE, BOYD, PEARCE and JONES, JJ.

*George Whitelock* (with whom was *Charles Marshall* on
the brief), for the appellant.

The facts shown by the books and records of the part-
nership from which the agreement of the partners is to be
deduced, are as follows :

1st. That the whole capital used in the business belonged
to the father, Charles J. Baker.

2d. That the sons did not contribute, nor were they re-
quired by the agreement to contribute any capital to the
firm.

3d. If there should be a loss of *capital*, that loss could fall only upon the father, because he only had any capital upon which the loss could fall, nor had he required the sons to furnish any capital.

4th. The failure of the sons to contribute to the loss of the capital would consequently be no breach of any agreement of the partners *inter sese* and would give no right to the father to sue them for contribution.

5th. The agreement of the parties among themselves was, that the sons were to give their services upon the invitation of the father in conducting an established business which belonged wholly to the father. This was to provide the sons with an opening, and, it must be assumed, the agreement with them was intended by the father to be for their benefit and advantage, and not to impose a burden upon them. If, therefore, the evidence furnished by the books might lead to either one of two results as to what the agreement was among the three parties, that result .must be intended which would make the contract one that would confer a benefit upon the sons, and not that result which would make the contract one to impose a burden upon them.

6th. The sons, by the agreement of the three partners, were not to get any salary for their services, but they were to be paid for their services by being allowed a percentage on the net profits ascertained at the end of each period of six months. Those net profits are the profits that remain after deducting all expenses, losses and bad debts to the date of each settlement.

7th. If no net profits remained at the time of any settlement, the sons got nothing for their services rendered since the preceding distribution of profits, until and unless profits are afterwards earned.

8th. If at the time of any settlement losses have occurred, there was no agreement among the parties that those losses should be made good by the joint contributions of the partners out of their own pockets. Those losses

must have arisen from debts incurred by the firm, or by depreciation in the value of its assets. If the losses occurred in whole or in part by reason of debts incurred by the firm, the creditors to whom those debts became due must have been paid by some one, as the firm did not fail or suspend payment at any time. If those debts were paid, they were not paid by either of the sons, and must have been paid by Charles J. Baker, who owned all the capital of the firm. But the agreement of the partners *inter sese*, as shown by the books, was that if debts were paid when there were no profits made with which to pay those debts, the amount so paid by Charles J. Baker was retained and carried over until profits were made out of which to make it good. Those profits were first applied to pay the amount of the debit balance so carried over, and then and not until then was there a share of profits distributed among the partners, and the agreed share of each partner of what remained passed to the individual credit of that partner.

9th. The agreement of the partners, as shown by the dealings recorded in the books, was therefore that the losses and debts of the firm were to be paid out of its profits, if profits were made, and that the junior partners were to give their services and be paid for their services out of any profits that might remain after payment of all losses and debts.

10th. The junior partners under this agreement were not to be paid for their services unless there were profits earned, over and above all losses, including all losses arising from debts of the firm. Those debts had to be paid out of earnings of the firm as soon as there were earnings. So far as the junior partners were concerned, those debts were never paid otherwise, and those junior partners were to receive nothing for their services unless and until those debts had been paid out of profits, and then they were to receive only a share of that surplus, according to a rate of division agreed upon between their father and themselves.

11th. The agreement shown by the records made the compensation of the juniors depend wholly upon the value of their services, and was apparently intended to stimulate their efforts. Their compensation was contingent upon the results of their efforts, and was regulated entirely by that result. It was not affected in any degree by the state of their individual accounts with the firm.

It is not easy to find in these facts evidence of an agreement among the partners, which would result in making the junior partners bind themselves to their father to work for the firm for nothing unless enough were made to pay all debts and leave a surplus for distribution among the partners, and at the same time bind themselves to bear a share of the debts and losses of the firm out of their own means outside of the business. Such a contract would surely not be proposed by Charles J. Baker to his two sons at their outset in life. It would be practically as if he had said to them : " Come into my business and work for me. If we succeed and make money, I will give you a part of the results of your labor. If we incur losses instead of making money, you shall have nothing for your labor, but you must bear part of the losses. All you contribute to the firm is your labor and services. I have all the capital in it and give my services also. If the venture is favorable, I will take part of the fruits of your labor and give you part. If the venture results in loss, you must not only bear the whole loss of your labor, but you must share with me the loss of my capital. Heads I win, my sons, tails you lose."

It is hard to believe he proposed such harsh terms to his sons just beginning their business life. They could readily have made better terms with a stranger. Any stranger would have agreed to accept their services as long as he wished to have them work for him, (a life-work it may be, for there were no limits to the partnership,) on terms that they were never to be paid for their services except by a share fixed by their employer of such profits as their employer might have left, after first paying all debts

and losses of his business  It is doubtful if any stranger would have proposed such terms, as the appellee seeks to establish from the course of dealing, at least since the adoption of the amendment of the Constitution of the United States abolishing slavery.  But it is certain that no stranger would have asked to have another term inserted in the contract of employment, namely, that " while you must bind yourselves to work in my business and upon my property without pay, unless I make profits over and above all losses in my business, in which event you shall have for your services a share of the profits ; but if there are losses instead of profits, instead of getting paid for your work you must contribute to pay those losses and get nothing for your services." Such an offer might have been made to these two young men by a very harsh stranger, but the books demonstrate that such was not the contract made by Charles J. Baker with his two sons, who rendered faithful service to him on his invitation during the best years of their lives.  That he did not make such a proposition is demonstrated by the whole course of dealing between him and them to the day of his death.

*John J. Donaldson* and *George R. Willis*, for the appellee.

1.  A partnership did exist between the deceased and the appellees.  This is admitted by the pleadings and proved without contradiction by all the evidence, documentary and oral, in the case.

2.  Inasmuch as there was no partnership agreement in writing, the terms of the partnership must be ascertained from the books.   *Stewart* v. *Forbes*, 1 Hall & T. 461; *Coventry* v. *Barclay*, 3 D. J. & S. 320; *Fleischman* v. *Gottschalk*, 70 Md. 523; *Whiting* v. *Leakin*, 66 Md. 255.

3.  As to the division of profits when made, the proof furnished by the books is perfectly clear, that, beginning with June 30, 1888, profits as made were divided in the following proportions, viz.:  Charles J. Baker, 40 per cent; William Baker, 30 per cent, and Charles E. Baker 30 per

cent, and this continued during the remainder of the partnership. When part of the firm's real estate was written up to an increased valuation on the books, the amount of the increase was divided *as a profit* among the partners in the same proportion as the other profits.

4. As to the losses, these from the beginning of the partnership were, *in effect*, divided between the partners in the same proportion as that in which profits were shared. They were dealt with as follows, viz.: They were charged in gross to the profit and loss account, and so went in reduction of the profits divided as effectually as if they had been charged up in the profit-sharing proportion to each partner.

Nor can this be affected by the fact that the book-keeper, *by the direction of one of the appellants*, charged the whole losses on June 30, 1894, to the individual account of the now deceased partner, *as this was done absolutely without his knowledge.*

5. But, even if this were not unmistakably shown by the books, there remains the principle, that in a partnership losses are to be borne in proportion to the sharing of the profits, unless a contrary agreement is shown. *Lindley on Part.* (5th Eng. Ed.), 385; *Whitcomb* v. *Converse*, 119 Mass. 38; *Paul* v. *Cullum*, 132 U. S. 539; *Oppenheimer* v. *Clemmons*, 18 Fed. R. 886, 888; *Whiting* v. *Leakin*, 66 Md. 255.

6. And this principle holds good, even though all the capital has been furnished by one partner. *Greenham* v. *Gray*, 4 Ir. C. L. R. 501; *Flagg* v. *Stowe*, 85 Ills. 164; *Lengle* v. *Smith*, 48 Mo. 276; *Moley* v. *Brine*, 120 Mass. 324; *Whiting* v. *Leakin*, 66 Md. 255.

PEARCE, J., delivered the opinion of the Court.

This is a bill filed in the Circuit Court for Baltimore City by the appellee as executor of Charles J. Baker, deceased, against the appellants, two of his sons, as surviving partners of the firm of Baker Brothers & Co., for an accounting, and for contribution by them to the losses of

the firm in proportion to their respective interests therein. The answer to the bill, while admitting the partnership charged, set up two defenses to the relief prayed; first, that the appellants never were liable, as between themselves and their deceased partner, for any of the losses or debts of the firm, and second, that if they ever were so liable, such liability was fully discharged by certain proceedings had for that purpose, under the authority of the Orphans' Court for Baltimore County, having jurisdiction of the settlement of the estate of their deceased partner, and constituting a full accord and satisfaction of the claim of the appellee for an accounting and contribution.

It was established by the testimony that the whole of the capital of the firm was supplied by the deceased partner, and that the appellants were never required to supply any capital, but that the profits were divided between them, whenever profits were earned, in proportions varying from time to time; that all the debts of the firm had been fully paid by the appellee as executor of the deceased partner, and that upon payment of all said debts there was a loss of capital of $136,400, of which $113,400 was caused by depreciation of real estate below the figures at which it was carried on the books.   It is seen, therefore, that only the rights of the partners *inter sese* are concerned in this inquiry, and we shall consider first the second defense presented.

We must agree with the Judge of the Circuit Court that the proceedings in the Orphans' Court of Baltimore County by which the appellants bought certain assets and conveyed other partnership property for the uses of the will of Charles J. Baker, did not operate as an accord and satisfaction of the partnership liabilities, though it is by no means clear what was the full consideration to the appellants for the conveyances by them of their interest in the real and leasehold property theretofore belonging to the firm, and the assignment of their interest in all assets of the firm, other than those purchased by them.   On the 9th of December, 1895,

all the parties entered into a written agreement to submit to Mr. Chas. C. Homer and to Mr. John T. Mason, R, as arbitrators, certain questions relating to the settlement of the affairs of the firm, among which was the question of the liability of the appellants to contribute to any loss of capital. *But this arbitration, for some unexplained reason was abandoned.*

On January 4th, 1896, the appellants submitted their written proposition for the purchase and conveyances mentioned above, but they did not make a condition of its acceptance, that they should be released from liability for losses. They merely declared they did not admit such liability. On receipt of that proposition, the appellee on January 5th, 1896, filed a petition in the Orphans' Court, reciting the proposition; stating its belief that it was for the interest of the estate it should be accepted as the only alternative to a disastrous receivership, but expressly denying the suggestion of the appellants that the appellee was *solely liable* for the debts of the firm, while admitting it was liable *to the creditors*, on demand. On January 8th, 1896, the Orphans'. Court authorized the acceptance of the proposition, and the payment by the appellee of all claims for which the estate was liable, when properly authenticated; and on January 21st, 1896, the appellants executed a conveyance and an assignment consummating the transaction, and an agreement of even date setting forth all the details of the transaction, concluding with this clause; "It is also understood by said executor, and by said William, Jr., and·Charles E. Baker, that the question as to whether or not the said William, Jr., and Charles E. are personally liable for the liabilities of the firm is not concluded hereby." Whatever conclusive effect might otherwise be attributed to this, not altogether clear, transaction, we cannot say that it concluded a question which the parties themselves, in their solemn agreement carrying out the accepted proposition, have said was not concluded.

We come then to the defense first presented—that the

appellants never were liable, as between themselves and their deceased partner, for any of the losses of the firm. This partnership was formed Sept. 1st, 1865, when Charles J. Baker purchased the interest of Henry J. Baker and Joseph Rogers, Jr., in the firm of Baker Bros. & Co. and gave notice by publication that he had associated with him his two sons, William Baker, Jr., and Charles E. Baker under the old firm name. Charles J. Baker died Sept. 22, 1894, but the firm was continued under the provisions of his will until January 21st, 1896, when it was dissolved by mutual consent. There can be no question that the effect of Chas. J. Baker's publication, made with the knowledge of the appellants, had the effect to bind them equally with him, as to third parties, in all firm transactions; but it does not follow, merely because they were so bound to third parties, that they were also bound to share all losses of the firm. Mr. Lindley in speaking of the right of contribution—vol. 2, star page 754, 1st Am. from 4th Eng. Ed.—says : " It cannot exist if excluded by agreement, *and it is so excluded whenever those who would otherwise be contributories, have entered into any contract, express or tacit, amongst themselves, which is inconsistent with a right on the part of one to demand contribution from the others.* This is too obvious to require comment, but it must be borne in mind as qualifying the common saying that the right to contribution is independent of agreement." *Idem*, star page 781, vol. 2.

In *Welsh* v. *Canfield*, 60 Md. 473, this Court said : " Whilst in general, a partnership imports community of profits *and losses* among its several members, it cannot be doubted that whatever may be their legal liability to outside parties, as among themselves, a disproportionate interest as to profits and losses may be agreed on." It is very plain upon principle that a deficiency of capital upon liquidation, must be considered as any other loss, according to the terms of the agreement; and hence Mr. Lindley in treating of this subject—vol. 2, star page 808—says : " The only case which practically gives rise to difficulty, is when part-

ners have advanced or agreed to advance unequal capitals, and to share profits and losses equally. If nothing more than this is agreed, a deficiency of capital must be treated like any other loss ;   *   *   *   but if the meaning of the partners is that all debts shall be paid out of the assets, and that any surplus assets remaining after payment of debts shall be divided between the partners in proportion to their interests therein, or to their capitals, effect must be given to such agreement, and those partners who bring in most capital, must lose most." A necessary corrollary to this reasoning would seem to be, that where one supplied all the capital, under an agreement restricting the partnership to profits, when earned, and only after payment of all debts, that if on liquidation there was an impairment of capital, he who provided it must bear the whole loss. Here the only right growing out of the partnership relation, which is asserted in the bill, or which is involved in its consideration, is the right to require the appellants to contribute out of their own pockets to reimburse the executor of their deceased father and partner, for impairment of *his capital* and the payment of firm debts out of the father's estate. Our inquiry therefore must be, what were the terms of their agreement of partnership in this regard. There being no written articles of agreement, and the death of Charles J. Baker preventing recourse to the evidence of any of the parties themselves upon this point, we are confined to the course of dealing between the parties as shown by the partnership books and transactions, supplemented by the other competent testimony introduced to explain the course of dealing, from which the Judge of the Circuit Court states in his opinion he found nothing that would vary the general rule of partnership liability.

Now it is admitted that Charles J. Baker always supplied all the capital of the firm, and that the sons never did supply, and were never required to supply any. The books of the firm, confirmed by the testimony of Brauns, an expert accountant, and for over twenty years a book-keeper

of the firm, and by that of Myer, also an expert account-
ant, after full examination, show that throughout the whole
period from 1865 to 1894, the sons were never credited
with any share or interest in the property or capital of the
firm, and that they were never credited with anything more
than a certain percentage of net profits, and that when there
were no net profits, none of the partners received anything.
The father received nothing for his capital and services, and
the sons received nothing for their services, they having no
capital.    In this there was nothing unusual, it being settled
that the capital of a firm may consist of the mere use of
the property owned by one member of the firm.    " In such
case the title remains in the individual member during the
continuance of the partnership, and upon its dissolution,
the property is freed from such use." *Citizens' Fire Ins.
Co.* v. *Doll,* 35 Md. 106 ; *Whiting* v. *Leakin & Gorsuch,* 66
Md. 265.    The percentage of net profits which they re-
ceived varied, but the rule restricting them to profits never
varied.    The percentage ranged from one-sixth to one-
fourth for each of the sons, with the residue to the father.
Whenever these distributions were made, the individual ac-
count of each member was credited with his percentage,
and the profit and loss account was debited with the aggre-
gate amount.    At six of the semi-annual distribution
periods of June and December in each year, there were no
available profits, and no distribution was made.    At every
distribution period, all debts, expenses, and losses were
charged to profit and loss, and if there was still an unset-
tled balance of loss, such balance was carried over and
charged against the profits at the next distribution period.
No loss was ever charged to the individual account of any
partner, until June 30th, 1894, when the sum of $23,000—
amount of loss at that time, was charged to the account of
Charles J. Baker by direction of Charles E. Baker.    Con-
ceding, as we must do, that this entry would not bind the
appellee if not known to and approved by Charles J. Baker,
provided it would operate to his prejudice, we are of opinion it

could not so operate because under the agreement as we construe it, all debts were payable in primarily from profits, and if these were not adequate, then by Charles J. Baker, so that ultimately these losses must have been paid by him. It was shown by Mr. Blacklock, a witness for the appellee, after examining the books, that the net profits distributed, were what remained " after all charges and bad debts were taken out." This was the unbroken course of business between the partners. In accordance with this course of business when certain real estate which was carried on the books at $70,000, was appreciated in value to the extent of $19,000, this increase was in June, 1872, carried to profit and loss and distributed as part of the net profits. This was the correct disposition, because that distribution did not impair the capital of the father, which upon dissolution would remain *in specie*. This distribution was therefore no departure from the uniform course, and even if it were, having been made under the direction of the father, the sons could no more be required to contribute to its return to the estate, than they could be required to return a proportion of net profits distributed ten or twenty years before, to make good losses afterwards occurring. Net profits as defined above have been shown to be the only source, under the dealings of the parties, to which the sons could look for compensation for their services, and the only source to which the father could look for reimbursement for debts of the firm paid by him. We cannot believe, in the face of the evidence afforded by the partnership books, that the father meant if losses were incurred greater than the profits would discharge that his sons were not only to lose their labor, but to go down into their pockets to share with him the loss of his capital. The question we have to decide is one of intention and must be determined by a consideration of all the circumstances available for the construction of the contract. *Parsons on Contract*, p. 58. *Fleischmann v. Gottschalk*, 70 Md. 529. Our construction of the contract, as deduced from the uniform course of dealing between the

partners, is, that the father put his capital against the time and skill of his sons, believing that the profits alone, under the plan adopted, would discharge all the debts and protect his capital from impairment; the sons believing that the profits, after payment of all debts, would ensure them reasonable compensation for their time and skill.

The principle involved in this view of the contract is supported by Courts of acknowledged reputation, and by text writers of authority.  In *Everly* v. *Durborrow*, 8 Phil. 93, a bill was filed for an account between partners, where one contributed money, and the other time and skill, and the whole capital was lost, but the relief was denied by Judge Sharswood, who cited the following language from *Lindley on Partnership:* " Whatever at the commencement of the partnership is thrown into the common stock, belongs to the firm unless the contrary can be shown;" and then said what, he adds, does not contradict this, " At the expiration of this partnership this capital shall be returned without interest before the final division of profits.  But here there are no profits to be divided; there is no capital to return, Everly has lost his money, and Durborrow has lost what he set against it, his time and services enhanced in value by his knowledge of the business."  This, it is true, was a *nisi prius* decision, but the great name of Judge Sharswood gives it just authority.  The same view was held by the eminent CHIEF JUSTICE ROBERTSON, of Kentucky, in *Heran* v. *Hall*, 1 B. Monroe, 159, who said: " It is a general rule that when the capital of one party is money, and that of the other, labor or other personal service, they are not partners *inter sese* in the technical sense, merely because they had no mutual interest in the profits, and that nothing else appearing even considering them partners in the stock, he whose capital was labor, would not be liable to him whose capital was money for contribution for any loss of capital in the adventure ; *for in such a case each will have sustained a correspondent loss of his capital;* and neither of them would therefore be liable to the other for contribution."

In *Cameron* v. *Watson*, 10 Rich. Eq. (So. Ca.) 103, the same view was expressed by Chancellor Dunkin, quoting from Puffendorf: " In partnerships, where, on the one side, labor is contributed, and on the other only the use of money, that partner who contributed the money does not always admit the other to a share of the principal, but only to a share of the profit which such labor and money joined together might produce.   According to this rule, if there should be nothing gained by the partnership concern, A should lose his labor and B his interest, which would be equal and just.   And should the original stock be diminished, by the same rule, A loses only his labor, whereas B would lose interest and a part of his principal.   At the dissolution B would be entitled to claim his money capital before any division of profits.   A could claim nothing as profits until the amount put in by B was returned.   On the other hand, if it was not there B, who had thus risked his property, must submit to the loss."

In *Manly* v. *Taylor*, 50 N. Y. Superior Court, 26, this opinion is said to be sustained by the weight of authority, and in *Hasbrouck* v. *Child*, 3 Bosworth, 105, the subject is discussed by JUDGE MURRAY HOFFMAN with great learning and fullness.   After stating the general rule of equality, he says :   " The case is very different when labor is furnished as an equivalent for the use of money only, and not as of equal value with the money itself.   The contributor of capital has then a right to reclaim the amount from the fund. The contributor of labor is not liable for any part of a loss of such money.   *Res perit domino*, is the maxim strictly applicable ; and if any portion of the money is unexhausted the party who advanced it receives it back."   And in support of his statement he cites the passage from Puffendorf quoted in 10th *Rich.*, *supra*, and says, " after a careful examination of the English authorities, I am satisfied that we are at liberty to adopt any just principle for the valuation of labor contributed to the partnership funds, which the agreement of the parties does not preclude, and equity may dic-

tate  *  *  *.   It is obvious that had the losses exhausted the whole capital Hasbrouck would in effect be made the guarantor of Child's capital in proportion to his interest in the profits—I apprehend that the agreement does not imply this ; that the law does not warrant it, and certainly justice disclaims it."

The Pennsylvania, Kentucky and South Carolina cases to which we have referred have been reviewed and disapproved in *Whitcomb* v. *Converse*, 119 Mass. 43, but we are satisfied they state the sounder rule for the case before us.

We are confirmed in this conclusion by the language of the Supreme Court in *London Assurance Co.* v. *Drennen*, 116 U. S. 461, where the Court said " persons cannot be made to assume the relation of partners as between themselves, when their purpose is no partnership shall exist. There is no reason why they may not enter into an agreement whereby one of them shall participate in the profits arising from the management of particular property without his becoming a partner with the others, or without his acquiring an interest in the property itself so as to effect a change of title." And also by what is said in *Paul* v. *Cullum*, 132 U. S. 550. " While in the absence of written stipulations *or other evidence* showing a different intention, partners will be held to share equally both profits and losses, it is entirely competent for them to determine as between themselves, the basis upon which profits shall be divided and losses borne, without regard to their respective contributions whether of money, labor or experience to the common stock."

We think the decree of the Circuit Court was erroneous.

> *Decree reversed and bill dismissed*
> *with  costs  to  appellants  above*
> *and below.*

(Decided March 21st, 1900).