COLLIER, ADMINISTRATOR *v.* BENJES

[No. 144, October Term, 1949.]

*Decided April 14, 1950.*

The cause was argued before MARBURY, C. J., COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Benjamin Swogell* for the appellant.

*Everett L. Buckmaster* and *Robert L. Weinberg,* with whom were *Weinberg & Green, Winter & Bowen* and *George L. Clarke* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by Warren V. Collier, Jr., Administrator C. T. A. of the Estate of Richard P. Benjes, deceased, from the dismissal of his bill of complaint filed against John H. Benjes, appellee here.

Richard P. Benjes and his brother, John H. Benjes, in 1937, began the operation of a hotel and tavern known as Anchor Hotel in Baltimore City, as partners. At that time they opened a checking account in the Maryland

Trust Company in the following form: "Richard P. Benjes, in trust for himself and John H. Benjes, joint owners, subject to the order of either, the balance at death of either to belong to the survivor."

Mr. Oscar E. Ross, Assistant Treasurer of the Maryland Trust Company, testified in this case that he knew that the partners wanted that type of account. He could have given them any type they wanted. The bank carried partnership accounts. This was a checking account and was rather active. It was used by the two brothers both for the partnership and personal business. Richard Benjes was an educated man, having graduated from City College in Baltimore and having attended Johns Hopkins University for three years.

According to the auditor, Mr. J. Robert Shaw, a Certified Public Accountant employed by the Consolidated Gas Company, whenever a check was drawn out of this account for personal purposes it would be charged on the partnership books against that individual partner's account. In 1939, Richard P. Benjes married and one son was born as a result. Mr. Shaw met Mr. Richard Benjes first in Feburary 1942 in reference to the partnership's income tax statements. Mr. Shaw testified in this case that Mr. Richard Benjes at that time told him "that he and his brother had been boys together, grown up together, and went to school together, and had started in business a few years together on a shoe string. In examining the books he showed me the bank account and told me he wanted it set up on the basis that he and his brother would have an equal share in, whichever one passed away the balance would go to the survivor." When asked by the Court: "It was already set up that way, wasn't it?" Mr. Shaw replied: "He asked me to check that. He asked me to find out if it was set up that way to accomplish that purpose. I told him it was, but also told him to also consult his attorney, as I was not a legal advisor, and also to check with the bank, and he told me later he did both of these things." When asked what duties each partner performed in the operation of the

partnership Mr. Shaw replied: "John, the surviving brother, handled the bar, the repair work, and supervised the cleaning of the hotel and made general repairs. Richard was the business manager. He handled practically all of the contacts with the suppliers, hired the help, took care of the banking arrangements, signed the checks, and kept the records. He kept all of them himself."

On February 21, 1942, the account opened in 1937 was closed and a new account opened in the same bank in the same form as the 1937 account, and the bank book for the period 1942-1944 was also in the same form. At that time three cards were prepared for the bank's files and signed by John H. Benjes and Richard P. Benjes. All money taken in by the partnership was deposited to this account and all checks for expenses of the partnership were drawn against this account. If either partner drew money for personal uses from this account it was charged, as previously, to his capital account on the partnership books. Mr. Shaw further testified that he first met John Benjes on Election Day in 1944, several years after he had met Richard. When asked what was the occasion of that meeting Mr. Shaw replied: "I received a telephone call from Richard the day before and he told me he had something very important to discuss, and asked if I could come down and see him and his brother, and I saw them the next evening, and for the first time I met John. He [Richard] told me he had come up for draft examination and the doctors discovered he had tuberculosis and recommended that he see his own physician, which he had done, and they were sending him to Saranac within the next few weeks, and he asked if I would handle the book part or record part that he himself had handled, that John was unfamiliar with that sort of work, and we reached an agreement, and I told him I would be glad to do that until he returned. He expected to be gone not for too long." Mr. Shaw further testified that on that occasion in 1944 Richard Benjes "reminded me of our earlier discussion in 1942, when

I first met him, and asked me again, he says, 'You know how we wanted it,' because that is the first time I had met John, 'You know how we want this account set up, so that the surviving one will have the remaining cash in the account.' He asked me again, 'Is this set up proper to accomplish that?' I told him my own account was set up that way with my wife, and in my opinion that was the proper way to set them up to accomplish what he wanted. I again said I would check with Mr. Cox and also with the bank on that point." Mr. Cox was an attorney. Mr. Shaw also testified that John Benjes said: " 'That's exactly how we want this established.' He said, 'We have worked together for a great many years and whatever is left should belong to the one who is left.' "

Richard Benjes died on December 2, 1944. Two days later on December 4, 1944, John Benjes withdrew the balance of this account in the amount of $69,139.30 by a check signed by him. Richard Benjes' will was probated by the Orphans Court of Baltimore City and Harry B. Wolf, Jr., Esq. was appointed Administrator C. T. A. of his estate. Mr. J. Robert Shaw was employed to audit the books of the partnership as of December 2, 1944. He prepared an audit which showed an overdraft at the bank in the amount of $1,053.82. This overdraft represented checks drawn for partnership purposes against this account in the Maryland Trust Company before the death of Mr. Richard Benjes. That account having been closed by John Benjes before the checks so drawn reached the Bank, these checks were paid and carried as overdrafts by the bank. On the basis of the audit prepared by Mr. Shaw, the Administrator C. T. A. sold John H. Benjes his decedent's partnership interest for $12,500.00 by a release and assignment dated June 20, 1945, and the estate was closed.

In December 1948 Mrs. Richard Benjes received a letter from the United States Treasury Department claiming additional income taxes. Upon investigation her counsel became aware of the existence of the joint account

which had been withdrawn by John Benjes. Warren V. Collier, Jr., Esq. was later appointed Administrator C. T. A. of the Estate of Richard P. Benjes, after Harry B. Wolf, Jr., Esq. had resigned. On the 16th day of February, 1949, Warren V. Collier, Jr., Administrator C. T. A. of the Estate of Richard P. Benjes, Deceased, filed a bill of complaint in Circuit Court No. 2 of Baltimore City setting out in part the facts hereinbefore set forth and asking that the defendant below, appellee here, John H. Benjes, be required to set forth in detail a discovery of property of every kind belonging to the former partnership; that he be required to produce all books and papers of the partnership to be examined by the Court; that the appellee be required to account to the Court for the interest of Richard P. Benjes in the partnership; that the appellee be enjoined from transferring or disposing of the assets of the partnership; that the Court declare null and void the agreement entered into between John Benjes and the Administrator C. T. A. of the Estate of Richard P. Benjes, deceased; and for other and further relief. The appellant claims that all of the sum of $69,139.30 is a partnership asset. After answer filed and the taking of testimony in open Court, the Chancellor, by decree, dismissed the bill of complaint. From that decree appellant appeals.

We are of opinion that the estate of Richard Benjes is not barred by laches in this case. There is nothing to show that anyone having an interest in the estate of Richard Benjes, or counsel for any interested party, knew of this bank account or had reason to believe that it existed, until shortly before the bill was filed, John Benjes having withdrawn the money from the Maryland Trust Company two days after the death of Richard. It was not until the Internal Revenue Department wrote to Mrs. Richard Benjes in December 1948, two months before the bill of complaint in this case was filed, that anyone of interest knew of this account. The injured parties in this case remained "in ignorance without any fault or want of diligence on [their] part." *Berman v.*

*Leckner,* 188 Md. 321, 328, 52 A. 2d 464, 467 and cases there cited; *Berman v. Leckner,* 193 Md. 177, 185, 66 A. 2d 392, 395.

Of course, when a partnership has been formed the surviving partner is in a certain sense a trustee and sustains a fiduciary relationship to the representatives of a deceased partner. *Welbourn v. Kleinle,* 92 Md. 114, 48 A. 81, 123; *Fried v. Burk,* 125 Md. 500, 507, 94 A. 86.

There is nothing in the provisions of the Partnership Act Article 73A, 1939 Code, which prevents partners from agreeing as to the title of any specific assets. In the case of *Ottaviano v. Lorenzo,* 169 Md. 51, 179 A. 530, the partners agreed that the partnership property on the death of the survivor of two of the three partners should become the property of the third partner. Judge Parke said in that case 169 Md. at pages 61 and 62, 179 A. at page 534: "In this partnership relation the statute expressly recognizes that the rights of the partners with respect to their association are determined by their agreement. Code, title 'Partnership,' art. 73A, § 18; *Lindley on Partnership,* *11. See *Gerding v. Baier,* 143 Md. 520, 521, 524-526, 122 A. 675; *Welsh v. Canfield,* 60 Md. 469, 473, 474; *Baker v. Safe Deposit & Trust Co.,* 90 Md. 744, 753-759, 45 A. 1028, 78 Am. St. Rep. 463; *Paul v. Cullum,* 132 U. S. 539, 10 S. Ct. 151, 33 L. Ed. 430; *Ex parte Ruffin,* 6 Vesey, 127, 128. So, the proportions in which the members of the partnership are entitled to the property of the partnership depend upon the agreement into which the parties have entered. Subject to the rights of the creditors, it follows that, unless fraudulent, the partners may agree that the joint property of the firm be converted into the separate property of one of its members; and, by force of the doctrine of equitable conversion, courts of chancery will give effect, on dissolution, to this agreement whenever the conversion clearly appears to have been the intention of the partners. *Supra; Lindley on Partnership,* *334-*336, *348-*350, *697-*698; Code, art. 73A, §§ 18, 25(2) (a) ; *Fooks v.*

*Williams,* 120 Md. 436, 442, 443, 87 A. 692; *Story on Partnership,* § 372; *Collyer on Partnership,* (Am. Ed.) §§ 115, 125, p. 184; *Bolton v. Puller* (1796) 1 Bos. & P. 539."

In the case of *Noel v. Noel,* 173 Md. 152, 195 A. 315, a husband and wife conducted a partnership business under an agreement by which the profits of the business were to go to the survivor. After the husband's death the wife discovered that the husband, with no independent means or income of his own, purchased certain securities and had them placed in the joint names of himself and his mother and sister. Upon the husband's death the wife filed a bill in equity for an adjudication that she was the owner of the personal property in controversy. In that case Judge Parke, again speaking for the Court, said 173 Md. at page 161, 195 A. at page 319: "In so fraudulently violating his obligation to invest and have the evidence of ownership in the names of himself and wife as joint tenants, with the right [in the survivor], upon the death of either, to take the whole in severalty, the husband by this willful abuse of power became a trustee for the use and benefit of his wife as joint tenant, and the property, unless transferred for value to an innocent assignee or holder, was impressed with this trust. * * * *Springer v. Springer,* 144 Md. 465, 482, 483, 125 A. 162; *Jasinski v. Stankowski,* 145 Md. 58, 62, 63, 125 A. 684, 35 A. L. R. 275; *McIntyre v. Smith,* 154 Md. 660, 665, 141 A. 405." See also *Edwards v. Commissioner,* 10 Cir., 1939, 102 F. 2d 757.

In the case of *Ragan v. Kelly,* 180 Md. 324, 24 A. 2d 289, 291, the account read: "Edward F. Kelly in trust [until withdrawal thereof] for self and Agnes C. Ragan, joint owners, subject to the order of either, the balance at death of either to belong to survivor." Judge Forsythe for this Court said as to that form of deposit in 180 Md. at page 330, 24 A. 2d at page 293: "The circumstances under which deposits were made vary in many instances, but certainly since the decisions of this Court in the *Miholland-Whalen cases,* reported in 89 Md. 199, 43 A. 45, 44 L. R. A. 208, and 89 Md. 212, 43 A. 43, 44 L. R. A.

205, the legal effect of an entry in a bank book similar to the entry in this case has definitely been settled. The general rule there adopted, and since followed, is that the entry, as it stands, is a sufficient declaration of a trust as it, unexplained, indicates an intention to create a trust. But the entry may be explained and the intention it indicates may be rebutted. In any particular case, the question whether a trust in law has been created effectually to vest the fund in the survivor depends entirely upon the actual intention of the original owner of the fund at the time he had the entry in the bank book made. *Milholland-Whalen, supra.* In this case there now can be no question that the entry in Mr. Kelly's bank book is sufficient, as it stands without explanation, to vest the entire ownership of the balance of the fund remaining after Mr. Kelly's death in the appellant Agnes C. Ragan, provided it be found from all the facts and circumstances, under which the entry was made, that such was Mr. Kelly's definite intention." See also *Bradford v. Eutaw Savings Bank*, 186 Md. 127 at pages 134 and 135, 46 A. 2d 284.

In *Grimm, et al. v. Virts*, 189 Md. 297, 301, 55 A. 2d 716, 718. The account read: "Annie B. Reeser, in trust for her, Joseph E. Himes and Ella N. Grimm, joint owners, subject to the check of either, the balance at the death of either to belong to the survivor." Joseph E. Himes was the Nephew of Annie B. Reeser and Ella N. Grimm was her sister. This Court said in that case: "In view of the fact that one of the appellants was her sister, at whose home she lived, and the other appellant was the nephew upon whom she relied to attend to much of her business, her desire to give them more than her other relatives is a perfectly natural and understandable one. It does not, under the circumstances of the case, require any special explanation, since, as we have already said, we agree with the conclusion of the Chancellor that the evidence does not show that the grantor was of unsound mind or was in any way induced by fraud or undue persuasion to make the transfer."

In the case now before this Court there is no charge of fraud. The two brothers entered this joint adventure together. Richard P. Benjes was the business manager of the partnership. He took care of the banking arrangements, signed the checks and kept the records. He was a man who had had the advantages of an education. The official at the bank testified that the partners understood and requested the form of account opened in 1937 and later reopened in 1942. The 1942-1944 bank book was in this form. If John had died first the money would have become that of Richard. Mr. Shaw, a Certified Public Accountant employed by the Consolidated Gas Company, not shown to be at all prejudiced in this case and who had handled the partnership's accounts for the two brothers, testified definitely that on more than one occasion he was told by Richard Benjes that he wanted the account set up so that the surviving partner would have the remaining cash. John Benjes also told Mr. Shaw the same thing. Richard Benjes repeated this to Mr. Shaw in 1944 when he knew that he was ill with tuberculosis. There is no evidence in the case that one brother took any advantage of the other. In our opinion, the evidence corroborates the presumption that it was the intention of the two brothers that the remaining cash in this account on deposit with the Maryland Trust Company on the death of one should become the property of the other.

Likewise, in the instant case it is clear that it was the intention of these two partners that until the death of one all expenses of the partnership should be drawn from this account. The checks in the amount of $1,053.82 were drawn for debts of the partnership on the account, here in question, before the death of Richard P. Benjes. We are therefore of the opinion that John H. Benjes should pay to the appellant one half of that sum, or $526.91, with interest from June 20, 1945, when final settlement of the partnership business was consummated.

180

·We will therefore reverse the decree and remand the case for the passage of a decree to conform with this opinion.

*Decree reversed, with costs, and case remanded for the passage of a decree to conform with this opinion.*