JULIUS G. MERVIS *v.* SIDNEY DUKE ET AL.

[No. 15, October Term, 1938.]

*Decided October 28th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, and MITCHELL, JJ.

*Eldridge Hood Young,* with whom were *Young & Crothers* on the brief, for the appellant.

*Joseph W. Spector,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

On July 1st, 1933, Julius G. Mervis, Sidney Duke, and Philip Duke entered into a profit sharing agreement for the operation of a tavern in Baltimore City, under which Mervis was to furnish $500, in return for which the two Dukes were to manage the business, and pay to him one-third of its profits, without any liability in him for its losses, and to repay the $500 from profits.

The Dukes, appellees here, repaid part of the money advanced, but failed to pay the balance, or account for the profits of the business. Mervis thereupon filed the bill in this case to compel them to repay the balance of the money advanced, to account for the profits of the tavern business, and to pay to him one-third of any profits resulting from its operation, on the theory that he and the Dukes were partners.

They answered the bill, denied both the partnership and the agreement, and the case was tried on those pleadings. At the conclusion of the complainant's case, the court dismissed the bill on the defendants' motion, with-

out hearing any witnesses for the defendants in support of their answers. From that decree Mervis appealed.

There is in the record evidence, uncontradicted, of these facts: The two Dukes are brothers. Mervis married their sister, from whom he is divorced. He is a man of some financial resources, the Dukes, if not impecunious, were not infrequently in need of money, and on different occasions Mervis made or obtained loans for them.

In 1933 they were out of work, and proposed to Mervis that they open a restaurant and saloon at 103 N. Howard Street, in Baltimore, that Mervis should furnish $500 to start the business, that he should be a silent partner in it, sharing its profits but not its losses. Mervis agreed to the plan, leased the premises in which the business was carried on, paid the first month's rent of $125, advanced money for repairs and improvements, and made other expenditures for the benefit of the business, aggregating in all between five hundred and six hundred dollars, and the business was opened under the name of the Howard Tavern.

The evidence as to the precise nature of the relation between Mervis and the Dukes is sketchy. The only testimony as to the agreement is that of Mervis, who said: "Some time in 1933, both Sidney and Phil Duke were out of work and came to me with a proposition to open a restaurant and saloon at 103 North Howard Street, and proposed that I would be a silent partner in the business, just furnishing approximately $500.00 toward the purchase of fixtures, rent and equipment, and, after a good bit of negotiations, we went into the business. I was to have a third interest in the place and they were to manage it and get a third for their efforts which included their salary. * * * I might elaborate on that, if you will allow me. The original arrangement, your Honor, was that they were supposed to put in approximately $500 as well. We figured the business would take about $1,000 to start and I was to put in fifty per cent of it, and because both of them worked in the place, I was only to get one-third of the profits."

Later, when cross examined, he gave this testimony: "What kind of a partner were you supposed to be, were you supposed to share the profits and losses? A. There were not supposed to be any losses. Q. But you told his Honor you were a silent partner. Now a partnership, as you know, includes sharing losses as well as profits, doesn't it? A. As a rule, I would say. Q. Were you to share any losses? A. I was not to be active in the business, and, therefore, was not responsible for any losses. Q. You were not to be responsible? A. That is right. Q. So I understand your sole interest in the business was the investment of $500 as a limited partner, only to share in the profits? A. My interest in the business was to put in fifty per cent of the necessary amount to open the business and get one-third of the profits. We all agreed between ourselves it would take about $1,000, of which I was to put in about $500, and of which I put in about $600. Q. And you did all of that without agreement? A. Without any agreement."

When the business was first started Mervis was accustomed to go to the tavern on Saturday afternoons and help with the work, he signed, apparently as proprietor, tax returns for the business, which were sent to Annapolis, and he made a deposit for the service of gas, and became responsible for the gas bills.

The business appeared to be profitable and Mervis made numerous demands upon the Dukes for an accounting, which they failed or refused to give. In 1936 the Dukes asked him to put $500 more in it. They said it was not paying them a decent salary, that they did not see how they could pay him anything on his investment, but would continue to pay him $25 on account of "some of the back moneys" he had expended, and asked if he would transfer the business to their mother. He told them that until he got an accounting he would not transfer it at all, that "it was going to lay dormant" until he "knew what had happened". When asked if he had withdrawn from the business in 1936, he testified:

"I withdrew as far as paying any debts or having them

—your Honor, they threatened to get out of the place, remove all of the fixtures and furniture, unless I gave them another $500 to buy this license, and naturally I would not agree to that, and I told them if they did, they would have to assume the rent and the gas bills, particularly the rent for the time the place was vacated until they gave notice, and, in any event, I would not permit them to take the fixtures unless they stored them in my warehouse. Q. So that you withdrew as to all losses but you would not withdraw as to profits? A. That is right. Q. And you would not invest any money in getting a liquor license? A. No, I would not invest any more money. Q. And you still say that although you would not be responsible for losses of the business or expenses of the business, when they procured a liquor license at a cost of $750 instead of the $50 beer license, you are, nevertheless, entitled to its profits? A. I would think so, when I started the place."

It also appeared that the books, papers, receipts and accounts of the business are in the hands of the appellees.

The single question presented by the appeal is whether those facts made out a case which would warrant a court of equity in requiring the appellees to account to the appellant for the profits of the tavern business.

The case was decided in the trial court and argued in this court on the theory that the trial court was not authorized to require such an accounting unless it found that the parties to the agreement were partners. Whether there was a partnership depends upon whether a partnership can exist unless the partners share the losses as well as the profits of the business. Apart from that question the evidence, unsatisfactory as it is, is nevertheless sufficient to support a finding that the parties to this appeal were partners. Mervis furnished part of the capital, the lease of the tavern building was in his name, the business was carried on under the name of the tavern, he became responsible for a time for the gas bills, he testified that the Dukes themselves proposed that he come

into the business as a partner, and he made at least some tax returns of the business to the State.

That a partnership may exist between persons one or more of whom is as to the partners *inter sese* exempted from liability for partnership losses is not entirely clear. Expressions in *Turner's Excr. v. Turner,* 98 Md. 22, 34, 55 A. 1023, *Baker v. Safe Dep. & Trust Co.,* 90 Md. 744, 45 A. 1028, and *Houston v. Swartwout,* 161 Md. 279, 283, 157 A. 193; *Rowley on Partnership,* par. 70, may be said to favor the legality of such a partnership, and in 20 *R. C. L.* 826 that is said to be the better view. But a contrary opinion is indicated in 47 *C. J.* 673, *Ann. Cas.* 1913B, 1335, and many cases cited in 18 *L. R. A., N. S.,* 992.

But there seems to be no sound reasons why a partnership may not be created between persons, one of whom is exempted by the partnership agreement from liability for partnership losses if the parties so intend. A complete exclusive and inclusive definition of a partnership is impossible (18 *L. R. A., N. S.,* 967), although certain incidents of varying weight may be considered in determining whether the relation exists, such as a community of interest in profits, and in the partnership property, liability for losses, the contribution of labor or capital to the business, and a community of power in administration. 18 *L. R. A., N. S.,* 970.

But whether the relation between the parties was that of a partnership or merely that of parties to a profit sharing agreement, the right of the appellant to an accounting seems clear. Even if it be assumed that the relations between the parties were not those of a partnership, nevertheless they are so nearly analogous that the reasons for requiring an accounting in a partnership apply with equal force.

The jurisdiction of equity to compel an accounting in an action between partners where the object of the suit is a dissolution of the partnership is settled (*Pomeroy Eq. Jur.* sec. 2365), and while the general rule is that equity will not interfere to order an accounting "unless

a dissolution has occurred or is sought by the Bill" (*Ibid*), there are recognized exceptions to that rule. *Pomeroy, Eq. Jur.,* sec. 2366. "As (1) where one partner has sought to withhold from his co-partner the profits arising from some secret transaction; (2) where the partnership is for a term of years still unexpired, and one partner has sought to exclude or expel his co-partner, or drive him to a dissolution; (3) where the partnership has proved a failure, and the partners are too numerous to be made parties to the action, and a limited account will result in justice to them all. To this classification must be added the class of cases (4) where the agreement of partnership. contemplates settlements of distinct transactions, or at stated times." *Seeley v. Dunlop,* 157 Md. 378, 146 A. 271; *Miller's Eq. Proc.* 823. Certainly the relation between the parties to an agreement such as that between the parties to this appeal has some of the incidents of a partnership, and if the parties so intended, as to them *inter sese,* there is no apparent reason why it should not be so characterized. 18 *L. R. A., N. S.,* 970 *et seq.*

The case of *Zalis v. Orman,* 175 Md. 100, 199 A. 877, is authority for the view that equity may compel an accounting as to the profits of a business in which the parties are jointly interested, even though they are not partners, especially where the account books, records and documents of the business are in possession of one of the parties to the agreement, who refuses to permit the other party to inspect them, and discovery is essential to full and adequate relief. *Johnson & Higgins v. Simpson,* 165 Md. 83, 85, 166 A. 617; *Rowley on Partnership,* sec. 990; 1 *C. J.* 617, 612; 1 *C. J. S., Accounting,* secs. 22, 21, pp. 658, 657; *Zalis v. Orman, supra.*

So that, whether the relation be regarded as a conventional partnership, or that of parties to a profit sharing contract, the appellant is entitled to an accounting if it appears that there are profits in which he has a joint interest, for which appellees refuse to account, that the account books, records and documents which afford the only evidence of the amount of such profits are in the

possession of the appellees, who refuse to permit the appellant to inspect them, and that discovery is essential to enable him to secure adequate relief.

And since the evidence in the case was sufficient to establish those facts, appellant was entitled to a decree to account, and there was error in dismissing the bill. It follows that the decree from which the appeal was taken must be reversed and the case remanded for decree (1 *C. J.* 643), and further proceedings in conformity with the views expressed in this opinion.

> *Decree reversed and cause remanded for a decree and further proceedings in conformity with the views expressed in this opinion, with costs to the appellant.*