MESSALL ET AL. *v.* MERLANDS CLUB, INC.

[No. 71, September Term, 1963.]

*Decided November 12, 1963.*

*Motion for rehearing and to stay mandate in the interim filed December 12, 1963, denied January 3, 1964, and opinion modified.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, HORNEY and SYBERT, JJ.

*W. Perry Doing,* with whom was *Robert V. Smith* on the brief, for the appellants.

*William F. Hickey* for the appellee.

HORNEY, J., delivered the opinion of the Court.

While several secondary questions are presented on this appeal, the principal question is whether the tenant defaulted

either in the payment of the rent to the landlords or in the performance of other terms or covenants in the lease.

By a lease dated June 1, 1956, and amended October 26, 1956, the landlords (Victor R. Messall and Robert E. Howe) leased a tract of land in Montgomery County and the improvements thereon to the tenant (Merlands Club, Inc.) for a term of seven years to be used as a country club. On the expiration of the lease, the tenant, by properly following the procedures set out in the lease, had the options of either renewing the lease for an additional five years or of purchasing the property. If the tenant chose to renew the lease, it was afforded an option, if properly exercised, of purchasing the property at the expiration of the renewal term.

The lease as amended provided in part that as of November 1, 1956, the rent was to be payable in monthly installments consisting of a base rent of $2000 plus $2.50 per month for each member of the club in excess of two hundred and fifty, with a maximum monthly rental of $2850; that the tenant was required to furnish the landlords a sworn statement of the total membership as of the first day of each month; that any default in the payment of rent or any falsification of the total membership would be deemed a default under the lease; that, in addition to the monthly rent, the tenant was to deposit in a mutually "agreed upon" depositary a sum equal to one-twelfth of the annual taxes (estimated at $165) and one-twelfth of the annual insurance premiums on the leased premises (estimated at $100), and any default in the payment of either would constitute a default in the payment of rent; and that the tenant was "to keep and maintain at its own expense the demised premises in good repair, including painting."

In July of 1958, the landlords, having negotiated a first trust loan on the leased premises with a loan association (Guardian Federal Savings and Loan Association at Silver Spring), the tenant and landlords agreed that $1055 of the monthly rent due by the tenant would be paid by it to the loan association to satisfy the landlords' obligation under the trust loan and that the balance of the rent would be remitted direct to the landlords. At the same time—despite the fact that the landlords and tenant had subsequently agreed that the insurance premiums should

be paid direct to the insurance agent instead of in monthly installments to the depositary—payments in accordance with the terms of the lease of $100 per month for insurance along with $165 for taxes were made to the loan association (which had been furnished with a copy of the lease) to be placed in separate escrow accounts. As a result, from August of 1958 to April of 1961, a total sum of $1320 ($1055 plus $100 plus $165) was paid monthly by the tenant to the loan association, and, the loan association, not having been otherwise advised by either the tenant or landlords, set apart $265 of the sum according to the terms of the lease.

Sometime in April of 1961, an examination of the tax and insurance escrow accounts disclosed a deficiency of $916.94 in the tax escrow account and a surplus of $3400.80 in the insurance escrow account. As a result of this finding, the landlords demanded that the tenant pay to the depositary the deficiency in the tax escrow account, and informed the tenant that as of May 1, 1961, there should be an increase of $65 per month in the payments to the escrow accounts, $25 of which was for taxes and $40 for insurance. Subsequently, the landlords, after executing an indemnity bond to the loan association as the escrow agent, withdrew the surplus from the insurance escrow account.

In June of 1961, the tenant filed an action in equity seeking a declaratory decree as to the ownership of the surplus in the insurance escrow account. The landlords, replying, filed an answer claiming ownership of the surplus on the ground that it represented a deficit of $100 per month in the basic rental from August of 1958 to April of 1961, and a cross-bill, alleging that there were deficiencies in the payments of rent due and that the tenant had failed to keep the leased premises in repair; demanding an accounting of the rents due and a determination whether the monthly statements of the tenant as to its total membership were false; and seeking the ejectment of the tenant from the premises because of its defaults under the lease.

In January of 1963, after the taking of voluminous testimony, the chancellor found as facts that the word "members" in the lease as amended meant active dues-paying members and that the monthly sworn statements were correct; that the al-

legation as to repairs had been abandoned; that the rent payments from August 1958 to April 1961 were short $100 per month due to a mutual mistake of fact; and that the landlords were due $3298.20 from the tenant through the month of January 1963, but that this rent deficiency would be treated as a continuing mutual mistake. Pursuant to such findings, the lower court decreed that the $3400.80 surplus withdrawn by the landlords from the insurance escrow account belonged to the landlords and constituted part of the rent for the leased premises; and that the tenant should pay $3298.20 to the landlords as unpaid rent due through January of 1963, and upon failure to do so the clerk of the court was directed to issue a writ of ejectment.[1]

Thereafter, the landlords filed a petition to set aside the decree, and in opposition to the order temporarily staying the decree, the tenant filed a motion *ne recipiatur* [2] which was granted. The landlords' appeal is from the several orders and decree of the lower court.

We agree with the chancellor that the tenant had not defaulted either in the payment of rent or in the performance of other terms and covenants in the lease.

The chancellor found that the deficiency in rent from August of 1958 to April of 1961 was due to a mutual mistake of fact. Such a mistake has been defined as a clear impression in the minds of the parties as to the existence of a material fact on which the parties relied and acted, sufficient in importance to influence a person of ordinary intelligence, but which was not

---

1. We know of no such mandatory process as a writ of ejectment. The writ of execution issuable by a court of law in an action of ejectment is *habere facias possessionem,* but it is not appropriate for ordinary use of a court of equity. *Morrill v. Gelston,* 32 Md. 116. Formerly, there were writs of possession in the nature of *habere facias possessionem,* but these were eliminated by Ch. 399 of the Laws of 1957. As to the present application generally of a writ of possession, see Maryland Rule 637.

2. If the purpose of the motion was to bring about a prompt hearing of the petition to set aside the decree, a motion *ne recipiatur* was not necessary and was improper under the circumstances. Such a motion is usually made when a pleader desires that a pleading "be not received either because it is filed too late or is not properly verified." See Maryland Rule 322.

in reality an existing fact. *McNeely v. Philadelphia Nat. Bank,* 172 Atl. 111 (Pa. 1934). In the instant case, the fact alleged to have been believed by all parties was that the tenant was to make monthly payments of $1320 to the loan association and $845, plus $2.50 for each member in excess of two hundred and fifty, to the landlords.

The mistake seems to have occurred in this way: Out of the basic monthly rent (of $2000), $1055 of it, according to the agreement between the landlords and tenant, was to be paid to the loan association and the balance (which would be $945) was supposed to be remitted to the landlords. But, according to the terms of the lease, $165 was payable into the tax escrow and $100 into the insurance escrow. Moreover, since the tenant had purchased insurance to cover the leased premises until August of 1964, it would seem that no money should have been deposited in the insurance escrow (and the parties apparently acquiesced), but the loan association was never advised of this fact. Accordingly, the agreed outlay by the tenant for rent, exclusive of rent payment for memberships, ought to have been $2165 ($2000 basic rent plus $165 for taxes), $1220 of which *should have been* paid to the loan association and the balance of $945 *should have been* paid to the landlords. However, the inadvertent inclusion of $100 for insurance in the computation of the sum to be paid to the loan association resulted in the tenant paying the loan association $1320 (instead of $1220) per month, and the balance of $845 (instead of $945) was remitted to the landlords. Accordingly, this caused a rent deficiency of $100 per month or $3400 for the period from August 1958 to April 1961.

It is not clear from the record whether the tenant or the loan association made the mistake in calculating the sum payable to the loan association each month. But the result in the end, as we see it, is the same regardless of who made the miscalculation.

If it is assumed that the loan association computed the amount payable, as was likely, the chancellor was correct in finding that the rent deficiency resulted from a mutual mistake of fact. Although a loan association, as a depositary, is generally considered to act as a trustee, it can for certain purposes in rela-

36

tion to an escrow account serve in another capacity. See *Century Indemnity Co. v. State of Maryland,* 144 F. Supp. 671 (D.C. Md. 1956). We see no reason why it could not be both an agent and a trustee. It has been said that a depositary is an agent insofar as specific personal duties are to be performed and a trustee insofar as the funds placed in its hands are concerned. *Squire v. Branciforti,* 2 N. E. 2d 878 (Ohio 1936). In the present case, we think it is clear that the computation by the loan association of the monthly sum payable to it by the tenant was a function it performed in its capacity as an agent for both the landlords and the tenant. See *Kreuer v. Union Nat. Bank of McKeesport,* 119 Atl. 921 (Pa. 1923), wherein it was held that a depositary can be an agent for both parties to an escrow agreement. As the knowledge of an agent acquired in the course of its agency is imputable to its principals, *Durst v. Durst,* 225 Md. 175, 169 A. 2d 755 (1961), it follows that the mistake the loan association made became a mutual mistake of fact on the part of both the landlords and tenant which prevents the landlords from claiming there was a default under the lease. See *Logan v. Langan,* 140 S. W. 1031 (Ky. 1911), holding that a mistake in a lease is a defense to an action at law by a landlord to recover rent. See also *Pomeroy's Code Remedies* (3rd ed. 1894), § 93.

On the other hand, if it is assumed that the miscalculation was a unilateral mistake on the part of the tenant, it seems clear that the acceptance by the landlords of monthly rent checks for $845 (instead of $945), exclusive of the amount due for excess memberships, over a long period of time, constituted acquiescence—which is a species of waiver by tacit assent—by the landlords in the reduced monthly payments. While the general rule is that there can be no acquiescence unless the person against whom it is claimed had full knowledge of his rights and of facts which would enable him to take effectual action for the enforcement of such rights, *Armour Fertilizer Works v. Brown,* 185 Md. 273, 44 A. 2d 753 (1945), the record indicates that the landlords had knowledge of their rights since they had complained to the tenant concerning the amounts of the rent checks and, instead of doing something about the shortage, they con-

tinued accepting the rent in the reduced amount, apparently satisfied that the deficiency should continue. In *Saul v. McIntyre,* 190 Md. 31, 57 A. 2d 272 (1948), this Court had an occasion to say (at p. 36) that the "[c]onduct of the parties to a written contract not only may amount to construction of ambiguous provisions but may evidence subsequent modification of the contract." Although we do not go so far on this occasion as to say that the acceptance by the landlords of the lesser amounts of rent supports an inference of modification of the lease, cf. *Walker v. Assoc. Dry Goods,* 231 Md. 168, 189 A. 2d 91 (1963), we think it is clear, as the landlords concede may be the case, that their acquiescence in this continued course of conduct constituted a waiver of their right to declare a default under the lease because of the rent deficiency.

The landlords also claim that commencing in May of 1961 there was a rent deficiency by reason of the tenant's failure to pay the additional amount of $65.00 per month ($25 for taxes and $40 for insurance) the landlords had demanded should be paid into the escrow accounts. However, even though the demand was one the landlords had a right to make under the lease, we think that the tenant under the circumstances of this case was justified in not making the additional escrow payments. When the landlords withdrew the surplus from the insurance escrow account, the tenant instituted this litigation claiming that it (instead of the landlords) was entitled to the surplus in the insurance escrow account and that it should be first applied to any deficiency in the tax escrow account. Due to the complexities of this case, the chancellor properly appointed a special auditor to determine whether or not there was a deficiency in the rent (including the escrow payments). Until a definite determination had been reached by the chancellor (following the filing of the auditor's final report) as to the amount of the deficiency, if any, it was not unreasonable for the tenant to refuse to change its position and to continue making payments as it had done theretofore. Furthermore, since it was later shown that the insurance premiums had been paid to August of 1964 and that all taxes had presumably been paid up to 1962, it is apparent that the landlords were not harmed by the refusal of the tenant to pay the additional sums de-

manded. We hold therefore that the tenant's nonpayment of the landlords' demands did not constitute a default under the lease.

We think the contention that the chancellor erred in not permitting the landlords to introduce evidence showing the events and circumstances which took place after suit was instituted—such as their continuous demands that the tenant should pay the proper rent and escrow payments, their declaration that the tenant was in default under the lease and their refusal to accept further payments of rent—is without substantial merit. It may well be that the chancellor should have allowed the introduction of this evidence, but we cannot say that his refusal to do so was prejudicial error under the circumstances. Obviously, the primary purpose in seeking to introduce this evidence was to show that the tenant was in default in its rent and escrow payments—a fact of which the chancellor was made aware (if he had not known it before) by the filing of the audit prior to his signing the final decree—but it seems likely that the introduction of this evidence at the trial would not have affected the finding of the chancellor that there was no default. The exclusion of this evidence was at most harmless error and certainly does not warrant a reversal of the decree. The action of the chancellor in accepting the report of the auditor as correctly showing the rent and escrow payments due through January of 1963 was not improper and was in fact necessary in order to determine the amount the tenant was required to pay the landlords as of the date of the decree.

The landlords further contend that the tenant failed to make the necessary repairs to the leased premises as required by the lease. The chancellor found that the landlords abandoned this allegation during the trial of the case, but even if the landlords had no intention of so doing, the record discloses that substantial repairs had been made in recent years, which, we think, would have been sufficient to support a finding that the lease was not in default for failure to keep the demised premises in good repair.

Finally, we are of the opinion that the record supports the finding that the word "members," specified in the lease as one of the factors to be used in calculating the rent payments for the memberships in excess of the stipulated two hundred and

fifty members, means "active dues-paying members." Accordingly, the adjustments which were made in the rent payments on account of those members who had been dropped or reinstated was proper.

The chancellor, having heard the case at length, made certain findings of fact and came to the conclusion that the tenant had not defaulted under the lease but that it had to pay the landlords all arrearages in the rent and escrow payments. We cannot say that the chancellor was clearly wrong as we would have to do in order to reverse the decree: instead we think the chancellor's findings and conclusions of law were substantiated by the evidence and were correct. The decree appealed from (except as to the direction to the clerk to issue a writ of ejectment should the tenant fail to pay the balance of the rent found to be due to the landlords through January of 1963) will therefore be affirmed.

*Decree (except as noted in opinion) affirmed; the appellants to pay the costs.*