696 A.2d 473

**Gita K. SHAH, et al.**

v.

**HEALTHPLUS, INC., et al.**

**No. 1845, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

July 1, 1997.

328

Richard L. Swick (Swick & Shapiro, P.C., on the brief), Washington, DC, for Appellants.

Benjamin Rosenberg (Brenda J. Wilson, Rosenberg, Prout, Funk & Greenberg, Baltimore and Alan Richard Sachs, Towson, on the brief), for Appellees.

Argued before HOLLANDER and THIEME, JJ., and ROBERT F. FISCHER, J., (Retired, Specially Assigned).

THIEME, Judge.

This is an appeal from an order of the Circuit Court for Prince George's County dismissing appellant's third amended complaint. For the reasons set forth herein, we shall vacate the judgment of the lower court and remand for further proceedings.

## FACTS

On 7 November 1974, a group of physicians formed the Prince George's County Health Services Foundation, Inc., as a nonprofit, non-stock, individual practice association ("IPA"). Each physician initially contributed a minimum of $500 to capitalize the IPA and, as a result thereof, attained the status of a "participating member." Under the bylaws of the IPA, this status was conferred indefinitely, subject to termination for good cause.

Simultaneously, the members of the IPA also formed HealthPlus, Inc., a health maintenance organization, to provide marketing and other integral administrative support to the IPA. The operations of the two entities were so intertwined that they could be viewed as one and the same.

In April of 1984, the Board of Directors of the IPA ("the Board") voted to convert the IPA into a for-profit, stock corporation. Correspondence dated 28 September 1984 was sent to the members, indicating that each would be issued stock subsequent to the return of enclosed shareholders' and physicians' (or specialists') agreements. Appellants make numerous contentions with respect to this letter. Some allege that it was received. Some contend that it was not received. Others allege that the letter was received without enclosure; still others contend that the letter was received and the enclosed documents were executed and returned, despite appellees' claims that they were never received.

In 1992, HealthPlus made a tender offer to purchase the outstanding stock of the IPA members. Appellants, learning of this offer, expected to receive distributions accordingly. When no payments were received, Dr. Gita Shah wrote the IPA, therein documenting her membership, and demanded payment for her proportional share. Return correspondence to Dr. Shah indicated that there was no record of her returning the shareholders' agreement in 1984. Consequently, Shah had never been issued any stock and no longer had a membership interest in the IPA entitling her to any distribution. Other members, when made aware of Dr. Shah's experi-

ence, also demanded that the IPA "make good" on the tender offer. Each received a letter similar to that received by Dr. Shah.

A complaint was filed in the Circuit Court for Prince George's County. During the course of discovery, the complaint was twice amended. The court granted appellees' motion to dismiss appellants' third amended complaint.

In lodging its timely noted appeal from that judgment, appellants propound the following issues for this Court's adjudication:

1. Whether appellants, members of the nonstock, nonprofit corporation, Prince George's Health Services Foundation, Inc., had property interests in that corporation.

2. Whether the Board of Directors of the IPA owed legal duty to protect appellants' property interests when the IPA converted from a non-stock, nonprofit corporation into a for-profit, stock corporation.

3. Whether the Board of Directors of the IPA breached the legal duties it owed to appellants by initially failing to, and later refusing to, issue to appellants stock in the new for-profit corporation, notwithstanding the fact that other members had received such stock.

4. Whether appellants' claims against appellees are barred by the statute of limitations.

5. Whether the motions court erred in dismissing appellants' third amended complaint.

We shall answer "No" to question four and "Yes" to question five, and, accordingly, vacate the lower court's order of dismissal without reaching the merits of the other issues posed.

### DISCUSSION

We recently stated in *Warner v. Lerner*, 115 Md.App. 428, 431, 693 A.2d 394 (1997):

Upon [an] appeal from the granting of a motion to dismiss filed under Maryland Rule 2–322(b)(2), an appellate court must assume the truth of all well-pleaded relevant and material facts in the complaint, as well as all inferences that can reasonably be drawn therefrom. *Odyniec v. Scheider [Schneider]*, 322 Md. 520, 525 [588 A.2d 786] (1991). Dismissal is proper only if the alleged facts and permissible inferences, so viewed, would nonetheless fail to afford relief to the plaintiff if proven. *Morris v. Osmose Wood Preserving*, 340 Md. 519, 531, 667 A.2d 624 (1995); *Faya v. Almarez [Almaraz]*, 329 Md. 435, 443 [620 A.2d 327] (1993).

115 Md.App. at 431–32, 693 A.2d at 395. Thus, when reviewing an original pleading, we cannot sustain its dismissal if the facts therein set forth present, on their face, a legally sufficient cause of action.

■ Paragraph 27 of appellants' third amended complaint states that "plaintiffs learned *for the first time* in 1992 and 1993 that their ownership interests had been extinguished due to their alleged failure to return the shareholder's agreement—an agreement of which they were unaware." (Emphasis supplied.) Assuming this statement to be true under the *Warner* standard, and under the discovery rule and duty to inquire, discussed *infra*, limitations did not begin in the action underlying this appeal until 1992.

The trial court, in its memorandum opinion and order, stated:

"[T]hat these plaintiffs had actual knowledge that [the] IPA had converted to a stock corporation and of their option to take stock in the corporation. Further, they had actual knowledge of the necessity to sign and return a "shareholders agreement" in order to be issued a stock certificate. Therefore, any cause of action to be recognized as stockholders accrued at the time the defendant failed to provide the requisite shareholders agreement and issue a stock certificate. We hold that the three year statutory period mandated by § 5–101 of the Courts and Judicial Proceedings article began to run in 1984."

The trial court's order of dismissal improperly and erroneously made a factual determination on the merits, inasmuch as at that stage of the litigation such an adjudication was inappropriate. Although Maryland Rule 2–322(c) permits the disposition of a motion to dismiss, within whose adjudication the court consults matters outside the pleadings, to be treated as one for summary judgment, pursuant to Maryland Rule 2–501, the trial judge clearly ruled on the motion to dismiss appellants' claims. The dismissal resolved factually facial disputes raised within the four corners of the complaint despite the fact that until 1992 appellants specifically claimed a lack of knowledge as to the deprivation of their interests in the IPA. And while the record does not suggest that the lower court relied on any extrinsic material in reaching its conclusion, its findings not only went beyond and contravened the allegations of the complaint, but also deprived the parties of their day in court to litigate contested matters. Not only is this strictly prohibited on a procedural basis, but it is also contrary to the very notions of our system of justice. We accordingly hold that the trial court committed reversible error by dismissing appellants' third amended complaint.

## Statute of Limitations

Normally, appellate adjudication of the propriety of a motion to dismiss is limited to just that. Looking beyond that issue in the case *sub judice*, a question of both law and fact was superfluously answered by the trial court. As an instructive matter, we think it incumbent upon this Court to comment on the resolution of that issue so as "to guide the trial court or to avoid the expense and delay of another appeal." Maryland Rule 8–131(a). And while an adjudication on the merits has not yet occurred, we shall nonetheless discuss that issue, confining ourselves to those matters relied upon by the lower court in its memorandum opinion. Assuming the factual conclusion of the lower court to be correct, the analysis set forth herein is for the edification of all concerned parties. If during litigation alternative conclusions are made, our discussion will only apply to the extent that the facts warrant.

The circuit court's dismissal of appellants' case was largely predicated upon the expiration of the statute of limitations. Appellants' demand for relief, as stated in paragraph 34 of their third amended complaint, states:

Plaintiffs request the court to enter judgment in favor of plaintiffs and against defendant for the amount of money which was due plaintiff[s] for any dividends or other distributions of profit and or capital. Plaintiffs further request that the court enter an order:

(a) declaring that plaintiffs are shareholders of defendant corporations with all the rights and privileges of shareholders;

(b) directing that all records pertaining to plaintiffs' status as members of defendant corporations be corrected to reflect that plaintiffs have full rights as shareholders;

(c) directing that all necessary documents pertaining to the plaintiffs' status as shareholders[,] including any shareholders' agreements, stock certificates, or stock registers[,] be accomplished (sic) to reflect plaintiffs' status as shareholders;

(d) ordering other and further relief as may be deemed appropriate in order to provide plaintiffs full and complete relief.

■ Irrespective of the fact that only injunctive relief is demanded by appellants, an accounting is the only vehicle by which the relief prayed for can be attained. Although to date no Maryland court has decided the issue of the nature of an accounting action in the context of the timeliness of the commencement of suit therefor, "it seems clear than an action seeking an accounting is an action in equity." *In re Peebles' Estate,* 27 Cal.App.3d 163, 103 Cal.Rptr. 560, 562 (1972) (citations omitted). *See also, Chambers v. Blickle Ford Sales, Inc.,* 313 F.2d 252, 259 (2nd Cir.1963) (because action against directors for accounting is equitable, tort statute of limitations inapplicable); *Sialkot Importing Corp. v. Berlin,* 295 N.Y. 482, 68 N.E.2d 501, 503 (1946) (procedures governing equitable actions apply to an action for an accounting); *Trinity Co–op.*

*Apts., Inc. v. J.S. Bldg. Corp.*, 25 A.D.2d 891, 270 N.Y.S.2d 644, 645 (1966) (action for accounting damages and other relief was in equity); *Lester v. Ennis*, 25 Misc.2d 334, 202 N.Y.S.2d 878, 881 (N.Y.Sup.1960) (an action for an accounting is equitable in nature); *In re McCabe's Estate*, 80 Cal.App.2d 823, 183 P.2d 72, 75 (1947) (proceeding for accounting is equitable in nature); *but see Belcher v. Birmingham Trust Nat. Bank*, 348 F.Supp. 61 (N.D.Ala.1968) (in action against fiduciaries to both corporation and shareholders for salaries wrongfully paid, traditional standard of limitations apply under Alabama law). We shall therefore view appellants' claim as one for an accounting, and apply the law of equity in our resolution of the case *sub judice* insofar as it relates to limitations. *Alleco, Inc. v. Harry & Jeanette Weinberg Foundation, Inc.*, 340 Md. 176, 198 n. 6, 665 A.2d 1038 (1995) (an action for an accounting is equitable); *Adams v. Coates*, 331 Md. 1, 10, 626 A.2d 36 (1993); *Mervis v. Duke*, 175 Md. 300, 305, 2 A.2d 11 (1938).

In the most recent case on point, *Santa Claus Industries, Inc. v. First National Bank of Chicago*, 216 Ill.App.3d 231, 159 Ill.Dec. 657, 576 N.E.2d 326 (1991), the Illinois appellate court held that "an accounting action ... sounds in both law and equity, thereby invoking the applicability of the defense of limitations." *Id.* 159 Ill.Dec. at 660, 576 N.E.2d at 329. *Santa Claus* involved an assignor's action for an accounting and for fraudulent concealment against an assignee bank. The allegation of fraudulent concealment is clearly an action at law, thus explaining the dual characterization of the case applied by the Illinois bench and distinguishing that case from the one *sub judice*. Guided by prudence in the apportionment of the label of "law and equity" insofar as it relates to *Santa Claus*, we believe that while the portion of the action seeking an accounting is of an equitable nature and, in and of itself, is not subject to a defense of limitations, when coupled with the portion charging fraudulent concealment, an action to which limitations is applicable, the entire suit must comply with the civil procedures applicable to the more restrictive of the two counts in terms of limitations. Speculatively expanding on Justice Campbell's opinion in this case, we think it likely that had the

legal claim not been joined to the accounting claim the statute of limitations would not have governed.

Because the 3–year statute of limitations set forth in Courts and Judicial Proceedings § 5–101 solely applies to actions "at law," we hold that the trial court erred in dismissing appellants' complaint, inasmuch as the accounting demanded by appellants was equitable in nature.

We think it necessary to impart guidance to the lower court inasmuch as a conclusion as to appellants' acquisition of actual knowledge was subsumed in its original order of dismissal. In light of our holding above, as well as the trial court's collateral finding concerning the accrual of appellants' knowledge, a defense of laches will likely be generated by HealthPlus on remand. As a further basis for our continued analysis in this regard, we wish to preclude any future potentially erroneous interposition by the trial court of its earlier determination with respect to appellants' knowledge.

 Under the equitable doctrine of laches, a lack of diligence on the part of a party who fails to assert his rights may result in his being equitably precluded from later asserting these same rights if the opposing party has incurred prejudice or injury.[1] *Staley v. Staley*, 251 Md. 701, 248 A.2d 655 (1968). The assertion of laches as an affirmative defense to an equitable action must be evaluated on a case by case basis. *Schaeffer v. Anne Arundel County*, 338 Md. 75, 656 A.2d 751 (1995); *LaValley v. Rock Point*, 104 Md.App. 123, 130, 655 A.2d 60, *cert. denied*, 339 Md. 354, 663 A.2d 72 (1995). Coupled with a showing of prejudice and unnecessary delay by the party raising the defense, laches is appropriate when one fails to act with due diligence in the pursuit and enforcement of his rights. *Hill v. State*, 86 Md.App. 30, 585 A.2d 252 (1991).

---

**1.** As observed by our predecessor Judge Thompson in *Cooney v. Board of County Commissioners of Carroll County*, 21 Md.App. 57, 60, 318 A.2d 231 (1974):

*Vigilantibus et non dormientibus jura subveniunt. Requiescat in pace.*[2]

2. The law aids those who are vigilant, not those who sleep upon their rights. May it rest in peace.

In *Jaworski v. Jaworski*, 202 Md. 1, 95 A.2d 95 (1953), the Court of Appeals held that, prior to the filing of a complaint for declaratory relief, continuous efforts by parties to an action toward the resolution of a controversy existing between them did not amount to a defense of laches. In *Jaworski*, the defendants, a brother and sister, were aware that the plaintiff, another brother, was erecting a home on land that had been bequeathed collectively to the parties by their deceased father, but had not yet been divided among them. But for ongoing "continuous efforts" by the parties to adjust their differences, laches might have been appropriate. With regard to laches, Judge Hammond, writing for the Court, espoused:

> "He who is silent when he ought to have spoken, will not be heard to speak when he ought be silent."

*Jaworski*, 202 Md. at 10, 95 A.2d 95.

Similar to the fashion in which "the statute of limitations begins to run when the potential plaintiff is on 'inquiry notice' of such facts and circumstances that would 'prompt a reasonable person to inquire further,'" *Doe v. Archdiocese of Washington*, 114 Md.App. 169, 188, 689 A.2d 634 (1997), delay relates to and is often a determinative factor in laches. Given the similarity of the two terms with regard to their respective applications, it is plausible to interchange them for the purposes of our discussion, bearing in mind that the employment of the term "statute of limitations" in this regard is purely as a term of art and for purposes of explanation only.[2]

 Shah takes the position that the statute of limitations did not begin to run until 1992, when appellants acquired actual knowledge of the alleged wrong, that their previously held membership interests in the IPA had been extinguished

---

2. Because both the trial court and the parties have addressed the issue of "delay" in the context of limitations, we think it easier to pursue the respective argument using the language and logic of the parties. Notwithstanding our pursuits in this regard, our resolution of the matter applies solely within the context of laches, not statute of limitations. Moreover, in no way should our use of the term "statute of limitations" be construed as any effort to undermine our forestated holding. Any efforts to so infer are misplaced and fallacious.

in consequence of the failure to return the shareholders' and physicians' agreements. When a question arises as to the commencement of the statute of limitations in a given action, a judicial inquiry must be made to determine legally and factually the date upon which the suit accrued. *Poffenberger v. Risser,* 290 Md. 631, 633–34, 431 A.2d 677 (1981). The *Poffenberger* Court, referring to *Harig v. Johns–Manville Products,* 284 Md. 70, 83, 394 A.2d 299 (1978), acknowledged that "plaintiffs may, in appropriate circumstances, 'be blamelessly ignorant' of the fact that a tort has occurred and thus, ought not be charged with slumbering on rights they were unable to ascertain." *Poffenberger,* 290 Md. at 635, 431 A.2d 677.

Some eighty years ago, in *Hahn v. Claybrook,* 130 Md. 179, 100 A. 83 (1917), the Court of Appeals pointed out that it was realized that notwithstanding the employment of due diligence, not every claim, particularly medical malpractice claims, can be discovered within the applicable period of limitations. Thus, under the then newly formulated "discovery rule," the cause of action accrues when the plaintiff knows, or reasonably should have known of the wrong. *Poffenberger,* 290 Md. at 634–35, 431 A.2d 677. This rule has been held to now be generally applicable to all actions *at law. Id.* at 636, 431 A.2d 677. Given the facts and issues here present, we shall also find the discovery rule to be equally applicable to the instant equitable accounting action as it proves useful in determining the commencement of a party's pursuit of his rights in the face of a defense of laches.

Digressing slightly, it is worthy to note that even if the discovery rule is extended to the beginning of the statute of limitations in a given action, the bill of complaint must still state with specificity those grounds upon which relief is predicated and upon which it can be afforded, *Scott v. Jenkins,* 345 Md. 21, 28, 690 A.2d 1000 (1997); *see also* Md. Rule 2–303(b), including, perhaps equally importantly, the reasons for the invocation of the discovery rule, *i.e.,* the cause of the aggrieved party's obtaining knowledge of the wrong at a time later than its initial perpetration. Appellants' third amended complaint

indicates that "[t]here was no indication that failure to return the shareholder's agreement would result in forfeiture of the member's 'equity interest[,]' " and that "[f]or the most part[,] plaintiffs did not receive this letter and were therefore unaware that there was a requirement to return the signed shareholder's [sic] agreement and physician[s'] agreement." We believe that appellants have set forth an ample basis for the discovery rule to apply, in and of itself, but particularly in light of our discussion concerning the fiduciary duty on the part of the Board, as discussed *infra.*

 Under the "discovery rule," there are two ways by which a plaintiff can acquire knowledge of a wrong committed against him; expressly and constructively. See *Villarreal v. Glacken,* 63 Md.App. 114, 130, 492 A.2d 328 (1985) (fraud delays the running of limitations until a party is aware of the fraud or should have been aware of it). As indicated in appellants' complaint, it is alleged that the members of the IPA were not specifically made aware that failing to return the respective agreements would result in a loss of their interests in the IPA. By default, then, delay must be measured from the time when appellants acquired constructive knowledge.

The Court of Appeals, in *Hecht v. Resolution Trust Corp.,* 333 Md. 324, 635 A.2d 394 (1994), a matter of first impression to the Maryland courts, held that despite the presence of constructive knowledge on the part of a corporate plaintiff, the statute of limitations in the corporation's suit against its board of directors for injuries to the corporation does not run "until there exists a disinterested majority of nonculpable directors." *Id.* at 339, 635 A.2d 394. The forestalling of limitations in this context, known as "adverse domination," is

based upon the recognition that where potential defendants are in control of the plaintiff corporation it is unrealistic to expect that those defendants will either facilitate discovery of a claim or assert a claim against themselves in favor of the corporation. Such actions are clearly adverse to their own interests....

* * *

*Id.* at 345, 635 A.2d 394.

> [C]orporate board members and officers control the corporation and constitute an insuperable barrier to a corporation's ability to acquire the knowledge and resources necessary to bring suit against the directors and officers. * * * The discovery rule provides that accrual [of limitations] takes place only when a plaintiff has notice of the existence of a cause of action. The doctrine of adverse domination presumes that actual notice will not be available until the corporate plaintiff is no longer under the control of the erring directors.

*Id.* at 346, 635 A.2d 394.

Although the instant case presents putative shareholders, rather than a corporation as a plaintiff, we believe the difficulties of each in pursuing a claim against a board of directors are the same, irrespective of the distinction, inasmuch as the duties and powers of a board of directors yield the same results in the aims of litigation being thwarted in fulfillment of the board's self serving needs.

Appellants can be charged with constructive knowledge of the divestiture of their interests in the IPA as of the time that a reasonable person should have inquired further based upon the totality of all attendant circumstances. In other words, under the facts of the instant case, subjectively constructive knowledge can be imputed to the members of the IPA on an objective standard. What muddies the water, however, is that appellants, as members of the IPA, were not acting *sui juris,* inasmuch as the board of directors of the IPA had a fiduciary duty to insure the interests of those who had an interest in it.[3]

---

**3.** At this juncture, we wish to stress unequivocally that our discussion of the fiduciary relationship between the Board and the members should not be construed as stating a position as to issues two and three posed by appellants. The applicability of our analysis of the merits of this issue are solely germane to the issue of statute of limitations, and therefore, any position taken by this Court in this regard shall not be viewed as the expression of a precedential opinion or decision to be used at the trial on the merits on remand.

See *Indurated Concrete Corp. v. Abbott*, 195 Md. 496, 503, 74 A.2d 17 (1950) (board of directors owes fiduciary duty to shareholders); *Waller v. Waller*, 187 Md. 185, 190, 49 A.2d 449 (1946); *Coffman v. Maryland Pub. Co.*, 167 Md. 275, 282–83, 173 A. 248 (1934). Maryland Code, Corporations and Associations Article (C & A) § 2–405.1 codifies the "business judgment rule," 62 Op. Att'y Gen. 804, 811–12 (1977), and states in pertinent part:

(a) *In general.* —A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:

(1) In good faith;

(2) In a manner he reasonably believes to be in the best interests of the corporation; and

(3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

Additionally, "[t]he ordinary rule applicable to a nonstock corporation . . . is that the provisions of Md.Code (1975, 1985 Repl.Vol.), C & A Titles 2 and 3, governing corporations in general, also govern nonstock corporations." *Chevy Chase Savings & Loan, Inc. v. State*, 306 Md. 384, 402, 509 A.2d 670 (1986); *Carter v. Glen Burnie Volunteer Fire Co.*, 292 Md. 165, 438 A.2d 278 (1981); see also C & A § 5–201. Thus, it is irrelevant that in the case *sub judice* the IPA was a nonstock, nonprofit entity, as the fiduciary obligation of the board of directors to appellants remains intact irrespective of the association's administrative classification and semantics related thereto. See *Downing Dev. Corp. v. Brazelton*, 253 Md. 390, 395, 252 A.2d 849 (1969); C & A § 1–101(t).

The Board of Directors, as agents of the IPA, also had a fiduciary duty to appellants, as principals of the IPA, including the requirement that they act in good faith. *Maryland Credit Finance Corp. v. Hagerty*, 216 Md. 83, 139 A.2d 230 (1958). On this basis, an argument can be made that any knowledge acquired by the Board, acting as agent on behalf of the member principals, is imputable to them, *Messall v. Merlands Club, Inc.*, 233 Md. 29, 36, 194 A.2d 793 (1963), and

that accordingly, appellants, in light of the Board's knowledge that failure to return the respective agreements would result in a forfeiture of prospective stock interests, were adequately charged with knowledge in light of this principal of agency. This logic is flawed, however, inasmuch as an interest of the agent, adverse to that of a principal, if proven, will render the knowledge obtained by the agent in this regard to be unimputable. *Hecht, supra; Golden Prague Bldg., Loan & Sav. Ass'n of Baltimore v. Crimi,* 172 Md. 238, 244, 190 A. 830 (1937).

The Board of Directors may well have stood to benefit from the transmutation of the IPA into a for-profit, stock corporation, in that each director was likely to acquire stock in the newly formed corporation. Given a hypothetical fixed amount of assets of the corporation, each share would be worth more money to the holder if fewer total shares were issued. This, of course, is in contravention of the principle that a director should not hold a competing interest to that of the corporation or a shareholder. *Indurated Concrete Corp., supra,* 195 Md. at 503–04, 74 A.2d 17.

While we wish to make no further suggestion with respect to this example, it is worthy to note that, if these facts were proven to be true, one might ponder whether such facts constitute constructive fraud.

Based on the allegations of appellants and merging the foregoing analysis of relevant principles of both agency and fiduciaries, a fact-finder could readily conclude that the delay did not begin to accrue in the instant case until 1992, inasmuch as before that juncture, appellants had no knowledge, and moreover had no reason to know, of the allegedly wrongful divestiture of their interests in the IPA. Under the facts of the case *sub judice,* appellants relied on the board, as both agents and fiduciaries, to act prudently on their collective behalf and to employ good business sense and judgment in so doing. In other words, appellants quite reasonably looked to the Board to be its "eyes and ears" with respect to the administrative affairs of the IPA. For approximately eight years, appellants' "eyes and ears" failed to report any sensory

perception of divestiture. It was therefore most reasonable for appellants to suspect that everything was *status quo* since this was the undisputable case with respect to the day-to-day aspects of what was once the IPA, now HealthPlus.

Appellees contend that appellants failed to exercise due diligence in ascertaining their rights as to their respective interests in HealthPlus. Appellees asseverate that appellants were, in essence, willfully blind to the lack of several items dispositive of stock ownership, *e.g.*, not receiving a stock certificate, not receiving notice of a shareholders meeting, and not receiving tax documentation evidencing dividends paid in a given year, and that "each [a]ppellant, who, by definition, is a highly-educated physician, failed, for eight years, to take any steps to determine why he or she did not receive any stock...." In the light most favorable to appellants, this argument is multi-dimensionally flawed. It is fatuous to say that solely because appellants are educated physicians they should be deemed to have known that for many reasons the events that transpired between 1984 and 1992 did not conform to applicable corporate law.

Indeed, just because one is educated in a particular area does not mean that he is a true renaissance person, savvy in all areas of the ways of life. This argument may be an attempt at subterfuge, attempting to shroud the more significant fact that the Board failed to uphold its fiduciary duty to appellants, including the aspect of acting in good faith toward them as principals.

The letter sent to appellants *via regular mail* concerning the conversion of the IPA into a for-profit stock corporation read, in pertinent part, as follows:

*[no letterhead or other identifier of origin]*

September 28, 1984

Dear IPA Member:

\* \* \*

If the terms of this Agreement meet with your approval, and you have executed either a Primary Care Physician

agreement or a Specialist Agreement with the IPA, please execute and date one copy and return it to the IPA *at your earliest convenience.* Upon receipt of the executed agreement, the IPA will mail you a stock certificate representing your equity interest in the IPA. No certificate, however, will be forwarded to a physician who has not returned an executed Primary Care or Specialist Agreement.

* * *

Sincerely,

/s/

James H. Cooper, Esq.

(Emphasis supplied.)

From the standpoint of assessing the propriety of the discharge of the Board's fiduciary duty causing the above letter to be written to appellants, glaring substantive and procedural deficiencies are manifold. In establishing a starting point at which to discuss each of these shortcomings, we employ an age old show business adage—"Take it from the top [of the letter]." Although there is a presumption that a mailed letter is received, *Miserandino v. Resort Properties, Inc.,* 345 Md. 43, 59, 691 A.2d 208 (1997); *Border v. Grooms,* 267 Md. 100, 104, 297 A.2d 81 (1972); *Bock v. Insurance Commissioner of State of Maryland,* 84 Md.App. 724, 733–34, 581 A.2d 857 (1990); *Cooney v. Board of County Commissioners of Carroll County,* 21 Md.App. 57, 60, 318 A.2d 231 (1974), it is ordinarily customary and reasonable for a correspondence of significance, in particular documentation regarding financial or legal matters as the above letter involved, to be sent by a form of delivery that can insure and provide acknowledgment of receipt. This statement should not be construed as imposing a duty to adhere to any specific form or method of delivery, but rather, with respect to the instant case, makes light of the fact that a reasonably prudent director similarly situated to the IPA Board of Directors should have endeavored to document delivery of the letter for efficiency and

precision purposes, and moreover, simply as "good business sense" in keeping records.

Insofar as the sender of the letter, James H. Cooper, Esquire, is concerned, the letter bears no indicia of Cooper's affiliation to any of the involved parties. The lack of a noted relation begs the question as to whether counsel was acting on behalf of the Board (and accordingly on behalf of appellants in light of the Board's fiduciary duty to them) or on behalf of another unknown entity such as HealthPlus, an organization whose interests were, at that time, clearly adverse to those of appellants. If the latter suggestion were the case, this would evidence an even more egregious breach of the Board's fiduciary duty by allowing opposing counsel to communicate directly with its principal.

Moreover, nowhere in the text of the letter is it stated that the failure of any appellant to return an executed document would result in the forfeiture of his ability to acquire stock in the newly formed corporation. It simply states that a certificate will not be forwarded to a physician who does not return the document and that the executed agreement should be returned *at the physician's earliest convenience.* No deadline whatsoever was mandated in this regard.[4] Subject to constraints of reasonableness, pursuant to the language of Cooper's letter, a physician who, at the time of the correspondence was out of the country on sabbatical, could return several years later and then, *at his earliest convenience,* return the executed agreement without being summarily stripped of his interests in the IPA.

It is therefore this Court's position that the discharge of the Board's duties of good faith and that of a fiduciary called for the Board to instruct appellants, not only that they would not

---

**4.** Often times, a stock certificate is held on behalf of an investor by a broker, or other responsible party, acting as a fiduciary. In accord with appellants' belief that the Board was acting on their behalf in this capacity, it would have been a reasonable belief on their part that this scenario was occurring. Nonetheless, while a stock certificate evidences legal title, it is a mere formality unnecessary to establishing the ownership of equitable title in a given stock.

receive a certificate if they did not return the agreements,[5] but that not receiving a certificate was tantamount to the forfeiture of any previously held interests in the IPA. Collectively, the letter's deficiencies, in addition to the continued "normal" activities of both appellants and the Board and its overall conduct in the procurement, or indeed the failure to procure, the signed agreements, shielded appellants from having any knowledge, or objective reason to know, that their interests had allegedly been forfeited in 1984 by virtue of their omission to return the agreements to the Board, and that as of that time, delay, insofar as it relates to a potential defense of laches, began to run.

JUDGMENT VACATED AND REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEES.

---

**5.** Although this Court is at odds with this "ultimatum," we need not express any opinion as to the propriety of this action at this juncture.